**LOCAL 620, ALLIED INDUSTRIAL WORKERS OF AMERICA, AFL–CIO,**

and

**Dura Corporation, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 16698, 16724.

United States Court of Appeals
Sixth Circuit.

April 8, 1967.

Richard M. Goldberg, Milwaukee, Wis., for petitioner, Local, 620, etc., David Leo Uelman, Goldberg, Previant & Uelman, Milwaukee, Wis., on the brief.

Donald S. Young, Detroit, Mich., for petitioner, Dura Corp., James D. Tracy, Dykema, Wheat, Spencer, Goodnow & Trigg, Detroit, Mich., on the brief.

Peter M. Giesey, Atty., National Labor Relations Board, Washington, D. C., for respondent, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., National Labor Relations Board, Washington, D. C., on the brief.

Before WEICK, Chief Judge, and O'SULLIVAN and PECK, Circuit Judges.

O'SULLIVAN, Circuit Judge.

The NLRB has found certain conduct of the Dura Corporation and Local 620 of the Allied Industrial Workers (AIW) violative of Sections 8(a) (1) and (2) and 8(b) (1) (A) and (2) of the National Labor Relations Act. Dura and AIW petition this Court for review of the Board's decision, and the Board cross-petitions for enforcement of the order it has entered in the case. The issue before us is whether conduct of Dura and the AIW union and their making of a bargaining agreement coercively interfered with the rights of employees in one of Dura's plants to choose their own bargaining representative.

Dura Corporation manufactures and sells automobile parts, lawn mowers, farm implements, and service station equipment at some thirteen locations throughout the United States. Its Motor State Products Division (Ypsilanti plant) in Ypsilanti, Michigan, manufactured exclusively, until June, 1964, convertible top frame assemblies for each of the major American automobile companies. Currently, it works mainly on tops for Ford Motor Company. Employees at the Ypsilanti plant have been represented by AIW since 1946.

In late 1963, executives at Dura concluded that the Ypsilanti plant was run on an excessive overtime basis; employees worked a 7 day week on two twelve-hour shifts, beyond the endurance and capacity of the workers and the plant's machinery. Various proposals to ease the situation were suggested, and finally in April, 1964, a plant was acquired in Adrian, Michigan, some 45 to 50 miles from Ypsilanti, to be operated as an additional facility. It was anticipated that the Ford line of convertible tops, constituting fifty percent of Dura's business in this field, would be retained in Ypsilanti, while the Fisher, Chrysler and American Motors lines would be transferred to Adrian.

News of the planned expansion reached the AIW, which reacted to what it considered a threat of reduction in jobs at the Ypsilanti plant if the move to Adrian took place. Dura was warned that it could expect a strike if it attempted to begin operations at the new site before any agreement had been reached protecting the Ypsilanti employees. Heated meetings and discussions ensued. Ways to meet the problem were suggested, considered and dropped. Finally a supplemental agreement to the existing master contract between Dura and AIW was drafted and executed. Its terms provided that employees at Ypsilanti, laid off because of seasonal lows in the automobile industry, would have the right to bump junior employees at the Adrian plant; all Ypsilanti employees had the right to bid in to jobs as they became available at the new installation. Dura also agreed to recognize the AIW as the bargaining representative of all its new Adrian employees. In exchange for these concessions the AIW allowed Adrian workers to be paid on a day rate, rather than according to the incentive-wage plan in effect at Ypsilanti. Life and health insurance benefits were higher at Ypsilanti, but other provisions of the master contract—vacation, holiday and

pension benefits—were carried over intact to Adrian. Transferees from Ypsilanti, however, in general would retain all the advantages they had enjoyed previously.

The supplemental agreement was reached on August 3, 1964. At that time the Adrian plant had begun operations and employed some 40 workers, all "new hires" from the Adrian area. AIW, which now purported to represent these employees, never made any claim to Dura that a majority of them had designated it as their bargaining agent. Nevertheless, on August 4, the Adrian workers were called together and informed by Dura's Ypsilanti director of industrial relations that a contract covering the Adrian plant had been negotiated between Dura and the AIW.

Two days later Dura received a letter from the United Auto, Aerospace and Agricultural Implements Workers of America, AFL-CIO (UAW) informing it that agents of the UAW had commenced an organizational drive among the Adrian plant workers, and that a majority of them had chosen it as their exclusive representative for purposes of collective bargaining. Prior to this time, the company had no knowledge of UAW's organizing activities. The letter advised Dura that no other union represented the involved Adrian employees and requested that negotiations leading to a contract begin.

Notwithstanding the UAW letter, Dura and AIW formally executed the supplemental agreement on August 14, 1964. Additional terms of that agreement, arrived at earlier, required Adrian plant employees be members of the AIW as a condition of employment; there was provision also for dues check-off by Adrian workers, but only ten or twelve employees ever signed a dues check-off authorization. No dues, however, were ever deducted by Dura on behalf of the AIW, and the union informed the company that it waived enforcement of the AIW membership requirement.

The accuracy of the foregoing facts is disputed in part by appellants; but such facts, and those hereinafter recited, were found by the Board, and we cannot say that they are not supported by substantial evidence. We, therefore, accept them. 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Both the Adrian and Ypsilanti plants are currently run as separate divisions of Dura Corporation, each reporting to Dura's vice-president in charge of manufacturing and sales activities. Each has its own plant superintendent and industrial relations director and does its own hiring, handles its own payroll and administers its own grievance procedures. Some tooling and dies were originally transferred from Ypsilanti to the Adrian plant, but most of the machinery the new installation uses in making convertible tops was acquired elsewhere. With the exception of the bows, components of the convertible frame assembly, that are made exclusively at Ypsilanti, the Adrian division does not depend on the Ypsilanti plant for any of its material or processing. The initial complement of manpower at Adrian went from 40 employees in August, 1964, to around 300 in December, 1964, and then leveled off to between 250 and 270. Ten workers from Ypsilanti transferred temporarily to Adrian in October–December of 1964, but none remained longer than a month or so; there has been no other interchange of employees between the two divisions. Petitioners attribute this fact, first, to the introduction of Ford's Mustang in the summer of 1964, the success of which kept the Ypsilanti plant in full time operation, without the anticipated cut-back in production; when seasonal layoffs did occur, transfers of any employees from Ypsilanti to Adrian were refused by Dura after the issuance of the unfair labor charge and pending the outcome of this action.

From these facts the Board found that the Adrian plant was not an accretion to the Ypsilanti plant and that there was not such a community of interest

and functional integration between the two facilities as to require them to be viewed as a single bargaining unit. It concluded that Dura Corporation and the AIW violated, respectively, Sections 8(a) (2) and (1) and Sections 8(b) (2) and (1) (A) of the Act,[1] by executing the supplemental agreement at a time when AIW was not the majority representative of the Adrian plant employees. It held that such conduct accorded unlawful recognition of the union by the employer, and infringed upon the statutory right of Adrian employees to choose freely their own bargaining representative.

In attacking the Board's determination appellants argue, first, that under the facts of this case the Adrian plant must be regarded as an accretion to the Ypsilanti plant, that a sufficient "community of interest" exists between the employees at the two facilities as to require that they bargain through the same representative. Second, the appellants urge that the issue properly before the Board was only whether Dura and AIW entered into a contract covering *an* appropriate unit in which the union represented a majority of the employees; and that the Board did not, in this case, have discretion to choose the appropriate unit.

We find it difficult to keep these contentions separate. Whether or not the Adrian plant was an accretion to the Ypsilanti plant, or whether the two facilities could be considered *an* appropriate single unit for collective bargaining is precisely the sort of issue to be left to the Board's discretion by Section 9(b) of the Act.[2] A unit is not a flexible thing, as broad or narrow as an employer and union care to make it. It is for the Board to decide, once the scope of a bargaining unit is called into question, whether or not such unit is appropriate for the purposes of collective bargaining. And this Court has said, in Metropolitan Life Ins. Co. v. NLRB, 330 F.2d 62, 65 (C.A. 6, 1964), rev'd and remanded on other grounds, 380 U.S. 525, 85 S.Ct. 1326, 14 L.Ed.2d 265:

"The Board has the authority under the Act to determine the appropriate units for collective bargaining. (Section 159(b), Title 29, U.S.C.) It has wide discretionary powers in this respect. What is an appropriate unit is a question of fact to be determined by the Board upon the facts of each case. Its decision will not be disturbed except for an abuse of discretion or violation of the statute. Packard Motor

1. § 8(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: *Provided,* that subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay; * * *

(b) It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to

prescribe its own rules with respect to the acquisition or retention of membership therein; or * * *

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

2. Section 9(b) states that "The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof."

Car Co. v. N.L.R.B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040; Pittsburgh Plate Glass Co. v. N.L.R.B., 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251; N.L.R.B. v. Prudential Ins. Co., 154 F.2d 385, 388, C.A. 6; N.L.R.B. v. Morganton Full Fashioned Hosiery Co., 241 F.2d 913, C.A. 4."

See also NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750, 756 (C.A. 6, 1965), cert. den. 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74.

■■ That this is not a representation case does not change the role of the Board. Nor is this a case where an appropriate unit was *already* in existence, and the Board attempted to bypass the procedural requirements of Section 9(c) of the Act (which allows dissatisfied minority employees to seek separate representation) by holding that a new operating division within the unit did not constitute an accretion thereto. See NLRB v. Appleton Electric Co., 296 F.2d 202, 206 (C.A. 7, 1961). Here the question was whether the boundaries of a valid bargaining unit could be contractually extended by an employer and union to cover employees at a distant plant who never indicated their support of that union. The Board found that the new facility did not constitute an accretion to the old plant, and that there was not a sufficient community of interest demonstrated between the Adrian workers and the Ypsilanti workers to justify the former being represented, without their acquiescence, by the same bargaining agent. From the facts detailed in the record before us—the existence of separate administrative units, the geographical distance between the plants, their lack of significant functional integration, the contractual differences governing the two groups of workers, the failure of any substantial interchange of employees to take place, even in the period preceding the lodging of the unfair labor complaint—we are not able to conclude that the Board's findings constituted an abuse of discretion.

■ We do not fault the vigorous effort of Dura and AIW to resolve the problems engendered by the transfer of operations from Ypsilanti. From the evidence it is clear that the AIW union employed strong pressures on the company —threats of a strike if any equipment was transferred for operations commenced at Adrian before a contract giving AIW exclusive bargaining rights at Adrian was concluded—but surrender to these pressures would not exculpate the company if by so doing the law was violated. Even assuming that the doctrine announced in Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) required the two parties to bargain over the consequences of such a transfer, we do not believe that any settlement which emerges is necessarily invulnerable to Board inspection. Indeed the Supreme Court in *Fibreboard* acknowledged that it was not possible to say whether a satisfactory solution could be reached in every instance that an issue was subjected to the process of collective bargaining. 379 U.S. at 214, 85 S.Ct. 398. As found by the Board, the agreement entered into by petitioners cannot be regarded as a satisfactory solution. The rights of the employees at Adrian to choose their own bargaining representative cannot be abrogated by the contract executed between Dura and AIW. See International Ladies' Garment Workers' Union AFL-CIO v. NLRB, 366 U.S. 731, 738, 739, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).

Enforcement of the order of the Board is granted.