**Samuel M. KAYNARD, Regional Director of Region 29 of the National Labor Relations Board, for and on behalf of, the National Labor Relations Board, Petitioner,**

**v.**

**MEGO CORP. and Samet and Wells, Inc. and Local Union No. 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Respondents.**

No. 79 C 2343.

United States District Court,
E. D. New York.

Feb. 9, 1980.

---

Vincent J. Coffey, Brooklyn, N.Y., for petitioner National Labor Relations Board.

Murphy & Sheehan, Mineola, N.Y., for respondents Mego Corp. and Samet and Wells, Inc.; Thomas Sheehan, Mineola, N.Y., of counsel.

O'Connor, Quinlan & Mangan, Long Island City, N.Y., for respondent Local Union No. 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; J. Warren Mangan, Long Island City, N.Y., of counsel.

## DECISION AND ORDER

BRAMWELL, District Judge.

Labor relations at the Brentwood, N.Y. plant of respondent employers Mego Corp. and Samet and Wells, Inc. have caused the National Labor Relations Board ("The Board") to resort to section 10(j) of the National Labor Relations Act ("The Act"), 29 U.S.C. Section 160(j) (1976), one of the most rarely used weapons in the Board's statutory arsenal. Section 10(j) gives a district court the power to enjoin alleged un-

fair labor practices[1] even before such charges become the subject of a formal hearing before the Board. An assessment of the propriety of this extreme remedy in the present case will be rendered through a recitation of this Court's Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Mego Corp. and Samet and Wells, Inc. (hereinafter referred to as "Mego") are a large domestic toy manufacturing concern (19).* During 1978, Mego derived over $500,000 in profits (19). Mego's corporate headquarters are located at 41 Madison Avenue, N.Y. (17). Mego issues all of its payrolls from this Manhattan office (49). The company's purchasing also is centralized (51).

Mego's manufacturing plants are situated on Orville Drive in Bohemia, N.Y., and 10 miles away at 50 Emjay Boulevard in Brentwood, N.Y. (18, 59). 160 Mego workers are employed at the Bohemia location (26). At the Brentwood plant, which started production in April of 1979 (29), Mego employs 80 individuals (41). All of the latter employees were "new hires" for Brentwood; none were transferred from Bohemia to work at the new location (34). Although the workers at both Brentwood and Bohemia are engaged in unskilled labor (26–28, 41), there is little, if any interaction between the employees at the two plants.[2]

Sixty percent of the work done at Brentwood concerns Mego's rubber skinned doll operation (29). The other 40% of Brentwood's operation comprises "pack out" of the items produced (31). Only 5% of the dolls packed out at Brentwood originate at the Bohemia plant (34). 80% of Brentwood's operation never was done at Bohemia (51), where 40 separate games and toys are produced (29).

Through July 1, 1979, Brentwood's plant manager hired all of the Brentwood plant's workers (35), in addition to sharing responsibility with the plant foreman for assigning employees their chores (47). The latter responsibility encompassed job training, transfers of assignments, discipline and overtime payments (48–49). Harry Rotenberg, the Vice President of Mego (17), is in charge of production for all the Mego plants (59).

On September 8, 1976, respondent Local Union No. 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter referred to as "Local 807") became the exclusive bargaining agent for the Mego employees at Bohemia (19). Accordingly, on April 14, 1977, Mego and Local 807 entered into a collective bargaining agreement covering the unit of employees at Bohemia (20). This agreement, in effect from July 1, 1976 until June 30, 1979, contained the following "accretion" provision:

> In the event that the employer divides the operation of its business or departmentalizes or further subdivides any of its operations, either in the same location or at different locations, and under the same name or different names, directly or indirectly, in whole or in part, all of the employees in all parts for all of the operation, wherever located, will be included in this unit and all of the parts or subdivisions of the operation of the Employer under whatever name and whatever entity, whether a person, firm or corporation and regardless of whether other individuals or persons may also have an interest in the entity, will be bound by the terms

---

1. 29 U.S.C. Sect. 158(a)(1) (1976) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of 29 U.S.C., and 29 U.S.C. Sect. 158(b)(1) (1976) makes it an unfair labor practice for a labor organization to restrain or coerce employees in the exercise of the rights guaranteed in section 157 of 29 U.S.C. 29 U.S.C. Sect. 157 (1976), referred to in the above cited sec-

tions, will be discussed in detail during the course of this Decision and Order.

* Throughout the course of this Decision and Order, the numbers within parentheses denote reference to the transcript of the Hearing held in this matter on October 17, 19 and 24, 1979 and on December 4, 1979.

2. See note 5 infra.

and provisions of this Agreement with the same force and effect as if it or they were a party signator at the time of its execution.

On June 29, 1979, Mego and Local 807 came to terms on a successor agreement (88). Mego representatives signed this agreement on September 24, 1979; Local 807 officials signed the agreement on October 3, 1979 (88).

Pursuant to their 1977 contract, both Mego and Local 807 intended to treat, and did treat, the Brentwood plant as an accretion to the existing agreement, thereby acknowledging Local 807 as the collective bargaining agent for the Brentwood employees (66, 69, 82, 88, 90, 129, 141, 142, 144, 145, 150, 160, 212, 218, 262, 287, 303, 306–07, 309, 350). Local 807 officially became the Brentwood collective bargaining representative on May 21, 1979 (179, 181). As a result, since May 21, 1979, the employees at Brentwood have been compensated for their services under the same wage and benefit schedule as that in effect at Bohemia (67, 311, 314).

Until June 27, 1979, however, neither Mego nor Local 807 made it clear to the Brentwood employees that they were covered by the Mego-Local 807 agreement (36, 40, 199, 282, 284, 336).[3] Moreover, during the first half of 1979, no dues were paid by Brentwood workers to Local 807, no pension or welfare fund payments were made to Local 807 on behalf of the Brentwood employees,[4] and Local 807 was not elected as collective bargaining representative by a majority of Brentwood employees (37, 38, 89, 158, 161, 310, 333).

In the midst of this rather incongruous situation, a walkout of the workers at Brentwood ensued. This occurred on June 27, 1979 (62, 194, 244, 280). The walkout expressed in dramatic terms the Brentwood employees' dissatisfaction with their wages, with the safety conditions in the plant and with the apparent absence of a union to represent their interests (63–65, 281). When they did find out about their supposed representation by Local 807, several of the striking employees expressed their disgust at Local 807's attitude toward the Brentwood workers (200, 201). Specifically, these employees complained about the fact that a contract purporting to cover the Brentwood employees was negotiated without the majority of said employees being informed of such negotiations (199, 290, 336). This contract was ratified during the strike (88).[5]

After they walked out of the plant, the striking Brentwood workers congregated in the plant's parking lot (195). Shortly thereafter, representatives of Local 101, International Brotherhood of Craftsmen, Professionals and Allied Trades (hereinafter referred to as "Local 101") arrived to assist the Brentwood workers in the expression of their grievances (193, 244). Angelo Rodriguez, a Brentwood employee, had telephoned Local 101's Brentwood office shortly after the walkout began (334).

By the end of the strike's first day, Local 101 possessed approximately 50 cards authorizing Local 101 to represent the signa-

---

**3.** Jack Lenihan, a representative of Local 807 testified that he received "about ten" authorization cards for Local 807 from Brentwood employees in April of 1979 (355). The Board, however, claims that it has seen only two such cards (357). The weight of the evidence at the hearing on this matter impressed upon this Court the fact that the Brentwood workers had no knowledge of Local 807's status at the Brentwood plant before June 27, 1979.

**4.** Three such deductions inadvertently were made. The amounts so deducted eventually were repaid (158).

**5.** It is unclear as to how many Brentwood employees participated alongside of the Bohemia employees in the ratification of the Local 807-Mego contract. Robert Nobile, personnel manager for Mego, testified that at least two and maybe six Brentwood employees attended the ratification meeting (100). Jose Guzman, a Brentwood employee, testified during his cross examination that five Brentwood employees attended the ratification meeting (324). The fact that so few Brentwood employees had notice of and attended the ratification meeting exemplifies the lack of communication and interaction between the Brentwood and Bohemia employees.

tories of these cards (195).[6] A representative of Local 101 brought these cards to the Board's Regional Office (202, 245). On July 2, 1979, Local 101 filed an unfair labor practice charge that condemned Mego's refusal to bargain with Local 101 (249). The striking Brentwood employees supported Local 101's efforts (69, 113, 204, 292). In fact, the Brentwood workers informed Mego representatives that they would only speak to them with a Local 101 delegate present (102, 115, 212).

On July 2, 1979, Mego sent telegrams to the striking employees informing the employees that, if they did not return to work by the next day, they would be considered to have quit their jobs (76, 78, 114, 116, 120, 123, 214, 298). Mego, however, never carried out the threats contained in the telegrams (140, 219, 310), even though it did hire temporary employees during the course of the strike pursuant to Local 807's request to do so (73, 127). The striking workers returned to work at the Brentwood plant on July 11, 1979 (140, 295).

Since that date, Local 807 representatives have visited the Brentwood plant on a number of occasions (141, 145, 339, 344) to distribute literature (141, 307), to speak to the employees (308, 340), and to minimize the import of Local 101's efforts during the strike (308, 340). Local 101 has been denied such access (260, 263). Although Brentwood workers have complained about Local 807's Brentwood visits (142, 309), Mego officials have taken the position that, pursuant to the accretion clause in the contract, Local 807 must be allowed access to the Brentwood plant because it is the collective bargaining representative for the Brentwood employees (144, 150). Local 101 has protested this state of affairs to Mego (147). On September 11, 1979, Local 101 filed a representation petition with the Board (173, 251).[7]

In accordance with the union security clause in the Local 807-Mego contract, Local 807, in a letter dated September 6, 1979, requested the discharge of all Brentwood employees who had not affiliated themselves with Local 807 (346). Mego, however, did not comply with this request (350). On December 4, 1979, Mego and Local 807 submitted a stipulation to this Court (375). That stipulation included the consent of the parties to an agreement that the security provisions within the contract would not be enforced during the pendency of the impending proceedings before the Board (Resp. Ex. G).

## CONCLUSIONS OF LAW

■ Under the Act, when considering a petition instituted pursuant to Section 10(j), the district court must ascertain whether there is reasonable cause to believe that an unfair labor practice has occurred and whether an injunction is just and proper under the circumstances. 29 U.S.C. Sections 160(j), (*l*) (1976). Both the "reasonable cause" and "just and proper" requirements will be given plenary consideration by this Court in connection with the instant petition.

### 1. The "Reasonable Cause" Requirement

The issue of whether reasonable cause exists to support petitioner's claim of an unfair labor practice by the respondent revolves around the validity of the accretion clause in the Local 807-Mego contract. Local 807 contends that the accretion clause authorizes it as the representative of the Brentwood workers. Of course, the Board disagrees. It argues that the policy underlying the Act does not sanction the application of the accretion clause to the employees at Brentwood. Thus, petitioner concludes that Local 807's present representation of the Mego employees at Brentwood constitutes an unfair labor practice.

---

**6.** Local 807 never had received authorization cards from an uncoerced majority of Brentwood employees. *See* note 3 *supra*.

**7.** This Court is cognizant of the fact that the unfair labor practice charge filed on July 2, 1979, in this matter forecloses any activity with respect to the representation petition filed by Local 101 (173–76).

■ The Board has analyzed the issue of whether a new bargaining unit accretes into a preexisting one by examining a host of factors. As the Board stated in *Peter Kiewit Sons Co.*, 231 NLRB 76 (1977):

Where, as here, we are concerned with more than one operation of a single employer, the following factors are particularly relevant; the bargaining history; the functional integration of operations; the differences in the types of work and the skills of employees; the extent of centralization of management and supervision, particularly in regard to labor relations, hiring, discipline, and control of day-to-day operations; and the extent of interchange and contact between the groups of employees.

*Id.* at 77. *See also Bryan Infants Wear Co.*, 235 NLRB No. 180 (1978). Once it has unearthed the factors relevant to the accretion issue in the case under consideration, the Board then decides the relative weight to be attributed to each factor.

Not surprisingly, this ad hoc procedure gives rise to results that do not lend themselves to simple interpretation, at least with respect to the weight to be given to individual accretion factors. Thus, whereas a number of Board decisions, in upholding accretion clauses, have emphasized centralized administrative organization as determinative, *see, e. g., Great Atlantic & Pacific Tea Co.*, 140 NLRB 1011 (1963); *Radio Corp. of America*, 127 NLRB 1565 (1960); *Hudson Pulp Co.*, 117 NLRB 416 (1957); *Saco-Lowell Shops*, 107 NLRB 590 (1953), others have placed overriding significance on the fact that the same activity is involved at both the new and the old facility, *see, e. g., Kennecott Copper Corp.*, 176 NLRB 96 (1969); *Simmons Co.*, 126 NLRB 656 (1960); *Richfield Oil Corp.*, 119 NLRB 1425 (1958). On the other hand, in striking down accretion clauses as being violative of the act, the Board has found local autonomy, dissimilar skills and the lack of interchange between the employees of the two plants or units as compelling. *See Renaissance Center*, 239 NLRB No. 180 (1979); *Bryan Infants Wear Co.*, 235 NLRB No. 180 (1978); *Centac Corp.*, 179 NLRB 313 (1969);

*Anheuser-Busch, Inc.* 179 NLRB 46 (1968); *Pay Less Drug Stores*, 127 NLRB 160 (1960).

Nevertheless, while specific factors do not provide a consistent dispositive solution to the accretion issue in each and every case, it is apparent to this Court that Section 7 of the Act, 29 U.S.C. Section 157 (1976) provides the governing yardstick against which all accretion cases are to be measured. Section 7 proclaims that:

Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

Thus, the appropriateness of a bargaining unit, as that term is defined in Section 9(b) of the Act, 29 U.S.C. Section 159(b) (1976), must be considered only after it has been determined that such a bargaining unit truly represents an uncoerced majority of the employees involved. The Board itself made this quite clear in *Melbet Jewelry Co., Inc.*, 180 NLRB 107 (1969) when it stated:

[t]he Board, here, must examine fundamentals and put the Section 7 rights guaranteed the employees and the appropriate unit concept of Section 9(b) into proper perspective. Excessive preoccupation with "appropriate unit" in the circumstances of this case leads to the abrogation of those rights. Section 7 of the Act is not subordinate to Section 9(b).. As the Board indicated in *Haag Drug*, [169 NLRB 877 (1968)] quite the opposite is true. Section 9(b) directs the Board to select units to "assure to employees the fullest freedom in exercising the rights guaranteed by this Act . . ."— which rights, of course, are those set out in Section 7.

*Id.* at 109. *See also C. H. Heist Corp.*, 186 NLRB 355 (1970). For this reason, the Board has taken an extremely narrow view of permissible contractual accretions. *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778 (5th Cir. 1973).

With this caveat in mind, the Court turns to its analysis in this case of the factors enunciated in *Peter Kiewit Sons, supra.* Unfortunately, the balance of the accretion factors relevant to this case does not decidedly tip in either petitioner's or respondent's favor. While Mego's centralized management (49, 51), the unskilled nature of the work at both Brentwood and Bohemia (26–28, 41), and the functional integration of the Mego operation (59) support a finding of accretion, the localized hiring (35), discipline (48–49) and control of day to day operations at Brentwood (47), as well as the lack of interchange between Brentwood and Bohemia employees,[8] dictate against such a finding.

Consideration of Section 7's mandate in connection with the situation at Brentwood, however, simplifies this Court's encounter with Section 10(j)'s "reasonable cause" requirement in this matter. This results because recognition of Local 807 at Brentwood fails to afford the Brentwood employees the protection of Section 7. Instead, such recognition subordinates "that freedom of choice which is the essence of collective bargaining," *International Ass'n of Machinists, Tool and Die Makers Lodge No. 35 v. NLRB,* 311 U.S. 72, 79, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940) to the rights provided by a contract entered into by Mego and a collective bargaining representative that the Brentwood employees expressly have disavowed. Such a circumstance convinces this Court that reasonable cause exists to support petitioner's claim that the recognition of Local 807 at Brentwood constitutes an unfair labor practice.

### 2. The "Just and Proper" Requirement

The "just and proper" standard that is so fundamental in a Section 10(j) proceeding has not received an authoritative interpretation from the United States Supreme Court. As a result, "the federal courts are in disagreement as to the meaning of the phrase "just and proper" and, thus, as to the appropriate function of a district court in passing on a section 10(j) petition."

Note, *Temporary Injunctions Under Section 10(j) of the Taft-Hartley Act,* 44 N.Y.U.L. Rev. 181, 183 (1969).

In the instant case, the Board contends that interim relief from this Court is necessary to prevent an entrenchment of Local 807 as the Brentwood collective bargaining representative for the duration of the imminent Board proceedings. These proceedings are expected to be lengthy. Such an entrenchment, the Board argues, could cause the destruction of the Brentwood employees' ties to Local 101, thereby eliminating the employees' freedom to choose their own bargaining representative.

The respondents counter by asserting that this circuit simply does not recognize such circumstances as providing grounds for a Section 10(j) injunction. In support of this contention, the respondents cite *McLeod v. General Electric,* 366 F.2d 847 (2d Cir. 1966), *vacated as moot,* 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967), where the Second Circuit stated that it was not "moved to affirm the grant of [a § 10(j)] injunction because the Board's procedures may be slow and tortuous." 366 F.2d at 850. *General Electric,* which appears to establish a presumption against the grant of a Section 10(j) injunction, *see* Note, *Temporary Injunctions Under Section 10(j) of the Taft-Hartley Act of 1947,* 44 N.Y.U.L.Rev. at 186, includes the following observation:

[Section 10(j)] in no way changed the extraordinary nature of the injunctive remedy. Nor did it change the basic purpose of the NLRA which envisaged a system in which the Board would, in the first instance, consider and decide the issues arising under the Act and pending before it, subject to later review by the Courts of Appeals. The Board, generally, has properly restricted itself to seeking injunctions only in cases of extraordinary circumstances, exercising its power "not as a broad sword, but as a scalpel, ever mindful of the dangers inherent in con-

8.  *See* note 5 *supra.*

ducting labor management relations by way of injunction."
366 F.2d at 849–50.

As is evident from *Seeler v. Trading Port, Inc.*, 517 F.2d 33 (2d Cir. 1975), however, *General Electric* need not be applied in this case so as to create the onerous restrictions suggested by the respondents. *Trading Port* presented the Second Circuit with the issue of whether a district court may use Section 10(j) to order an employer who has engaged in numerous unfair labor practices to bargain collectively with a union of its employees after that union has lost a representation election. In reversing the district court's denial of a Section 10(j) injunction under such circumstances, the Second Circuit recognized that Congress designed Section 10(j) to ensure that a "union's viability be maintained to the degree necessary to make final Board adjudication in the form of an election or a bargaining order meaningful." 517 F.2d at 38. In this regard, the court quoted the following excerpt from Section 10(j)'s legislative history:

> Time is usually of the essence in these matters, and consequently the relatively slow procedure of Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals, falls short of achieving the desired objectives—the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free and private collective bargaining. Hence we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief.  . . .

S.Rep.No.105, 80th Cong., 1st Sess. 8 (1947), *reprinted in* I NLRB, *Legislative History of the Labor Management Relations Act, 1947*, at 414 (1948).[9]

In the course of its discussion in *Trading Port*, the Second Circuit cited with approval several appellate decisions from other circuits that have recognized the efficacy of Section 10(j)'s use in order to prevent frustration of the basic remedial purpose of the Act and to protect the public interest. 517 F.2d at 39 (citing *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778 (5th Cir. 1973); *Minnesota Mining & Mfg. Co. v. Meters*, 385 F.2d 265 (8th Cir. 1967); *Angle v. Sacks*, 382 F.2d 655 (10th Cir. 1967)). A number of other cases decided after *Trading Post* also reflect the increasing awareness of "the fact that Section 10(j)['s] [enactment] is an indication that Congress desired courts to furnish relief at the appropriate time and in an effective manner." *Gottfried v. Mayco Plastics*, 472 F.Supp. 1161, 1165 (E.D.Mich.1979). *See also Eisenberg v. Holland Rantos Co., Inc.*, 583 F.2d 100 (3rd Cir. 1978) (district court grant of a Section 10(j) injunction affirmed); *Solien v. Merchants Home Delivery Service Inc.*, 557 F.2d 622 (8th Cir. 1977); *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735 (7th Cir. 1976).

■ An examination of the case at bar in the light cast by *Trading Port* and the other above cited cases demonstrates to this Court that this case does present circumstances of sufficient severity to warrant Section 10(j) relief. In the absence of such relief, the ultimate anomaly in terms of the policies suggested by the Act would occur. A unit of employees would be represented, for the duration of the proceedings before the Board, by a collective bargaining representative that it has refuted in demonstrative terms. In this regard, the record is replete with testimony from Brentwood employees attesting to their distaste for Local 807's attitude toward them during their tenure at the plant (63, 65, 102, 115, 142, 199, 200, 201, 212, 281, 290, 309, 336).

---

**9.** The Second Circuit, in *Trading Port* also characterized the situation in *General Electric* as one in which the union involved apparently could survive without irreparable harm the alleged unfair labor practices for as long as it took for the Board and the Second Circuit to adjudicate the dispute. 517 F.2d at 39. Thus, *Trading Port* can be read so as to sanction in this circuit a case by case analysis of the propriety of Section 10(j) relief in accordance with the immediate and ultimate impact of the unfair labor practice charged.

Moreover, continued recognition of Local 807 at Brentwood during the impending proceedings before the Board could do irreparable harm to Local 101, the charging party. William Koenig, Local 101's president expressed his fears concerning such harm when he testified that his concern over the potential effects of Local 807's "entrenchment" at the Brentwood plant caused him to request the Board to seek Section 10(j) relief in this case. Specifically, Mr. Koenig stated:

> What we're looking to do is some remedy to put back where we have a 50/50 chance of a fair—either election or eventual bargaining order from the National Labor Relations Board. As it presently stands, it's unfair and every day it becomes eroded more, our position, in the plant because we're denied access that is afforded to 807.

(263).

This Court is sympathetic to Local 101's plight. Undeniably, recognition of Local 807 as Brentwood's collective bargaining representative by Mego and the privileges of incumbency accompanying such recognition could erode Local 101's support at Brentwood so as to markedly diminish Local 101's likelihood of success in an eventual election at the plant. This set of circumstances leads this Court to echo the conclusion reached in *Goldfarb v. Service Motor Freight, Inc.*, 438 F.Supp. 18 (N.D.N.Y.1977) where the court stated:

> There can be little dispute that when an unfair labor practice results in the recognition as bargaining agent of a union which does not represent an uncoerced majority of employees, injunctive relief is not only just and proper, but is required to prevent an irreparable entrenchment of the improper union.

*Id.* at 24. Accordingly, this Court concludes that injunctive relief is just and proper in the instant case.

3. *The Nature of the Relief to be Granted*

██ Having found the requisites for Section 10(j) relief to have been satisfied in this case, the Court now must consider the scope of its injunctive Order. Case law instructs that section 10(j) injunctions should preserve or restore "the status quo as it existed before the onset of unfair labor practices." *Seeler v. Trading Port, Inc.*, 517 F.2d at 38; *McLeod v. General Electric*, 366 F.2d at 850 n.3. In this case, the alleged unfair labor practice at issue—the inception of Local 807's recognition as the Brentwood collective bargaining representative—dates back to May 21, 1979 (179, 181).

Prior to May 21, 1979, the rate of pay for Brentwood employees was less than that in effect on the date the Board filed the instant petition (167, 311, 314). Therefore, a resurrection of the wage rate in effect before the alleged unfair labor practice began would give rise to an economic detriment for the Brentwood employees. This Court declines to issue an Order that would so penalize the Brentwood workers. Such a directive would contravene the equitable principles underlying Section 10(j).

Accordingly, the Court is of the opinion that the wage schedule in effect at Brentwood on the date the Board filed this petition should control at the Brentwood plant as a consequence of this Court's decision in this matter. This is not to say, of course, that pension, welfare, medical or any other union benefit plan associated with Local 807 should also be in effect as a result of this Decision and Order. This Court's maintenance of present conditions at Brentwood refers solely to the governing wage schedule. It goes no further.

For the foregoing reasons, the instant petition for relief pursuant to Section 10(j) of the National Labor Relations Act, 29 U.S.C. Section 160(j) (1976), is hereby GRANTED, with the appropriate injunctive relief to be implemented in conformity with the provisions detailed in this Court's decision.

It is SO ORDERED.