633 F.2d 1026
 105 L.R.R.M. (BNA) 2723, 89 Lab.Cas. P 12,292
 Samuel M. KAYNARD, Regional Director of the Twenty-ninth
Region of the National Labor Relations Board, for
and on behalf of the National Labor
Relations Board, Petitioner-Appellee,
v.
MEGO CORP. and Samet & Wells, Inc. and Local Union No. 807,
International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of
America, Respondents-Appellants.
 Nos. 1177, 1178, Dockets 80-6038, 80-6060.
 United States Court of Appeals,
Second Circuit.
 Argued June 9, 1980.
Decided Sept. 12, 1980.
 
 Thomas Sheehan, Mineola, N. Y. (Murphy & Sheehan, Mineola, N.Y.), for respondents-appellants Mego Corp. and Samet & Wells, Inc.
 J. Warren Mangan, Long Island City, N. Y. (O'Connor, Quinlan & Mangan, P. C., Long Island City, N. Y.), for respondent-appellant Local 807.
 Genevieve Pluhowski, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Harold J. Datz, Associate Gen. Counsel, Joseph E. Mayer, Asst. Gen. Counsel, Joseph P. Norelli, Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D. C.), for petitioner-appellee National Labor Relations Board.
 Before FRIENDLY and MANSFIELD, Circuit Judges.*
 FRIENDLY, Circuit Judge:
 
 
 1
 Mego Corporation (Mego)[1] and Local Union No. 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 807), appeal from an order of the District Court for the Eastern District of New York, 484 F.Supp. 167 (1980), which granted a temporary injunction pursuant to section 10(j) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(j).[2] The order enjoined Mego from recognizing Local 807 as the collective bargaining representative of the employees at Mego's Brentwood, N. Y. plant and restrained both Mego and Local 807 from applying a previously negotiated collective bargaining agreement to the Brentwood employees pending disposition of a related complaint before the National Labor Relations Board.
 
 
 2
 The significant facts are not in dispute: Mego is a toy manufacturer headquartered in Manhattan, with centralized payroll processing and purchasing. Prior to 1979, its manufacturing plants were located solely in Bohemia, N. Y., where about 160 warehousemen and production and maintenance workers were employed. In 1976, Local 807 became the exclusive bargaining agent for those employees and negotiated a collective bargaining agreement set to expire on June 30, 1979. The agreement contained an "accretion clause" purporting to include in the bargaining unit and to subject to the terms of the agreement any new employees to be hired in a new department or at a new location.
 
 
 3
 In April, 1979, Mego opened a new plant in Brentwood, N. Y., approximately ten miles from the Bohemia site. Relying on the accretion clause, Local 807 demanded recognition as representative of the Brentwood employees, and Mego eventually complied on May 21. On June 27, however, as negotiations for a successor agreement between Mego and Local 807 were drawing to a close, the Brentwood workers-who were not apprised of Local 807's aspirations-staged a walkout to protest low wages, safety conditions in the plant, and their apparent lack of union representation. In response to a call from one of the strikers, representatives of Local 101, International Brotherhood of Craftsmen, Professionals and Allied Trades (Local 101), quickly arrived on the scene, and before the end of the day collected fifty union authorization cards from the eighty Brentwood employees. In contrast, a representative of Local 807 who attempted to address the strikers was rebuffed when the Brentwood employees expressed their anger at being "represented" by Local 807 without their knowledge or participation.[3] When Local 101 requested recognition as the exclusive representative of the Brentwood employees, the company refused, relying on its contract with Local 807.
 
 
 4
 On the third day of the strike Mego and Local 807 concluded negotiations for a new agreement, to be effective from July 1, 1979 until June 30, 1982. The agreement, containing language expressly extending its coverage to the Brentwood employees, was ratified the same day at a meeting of Local 807 in which only a handful of the Brentwood employees participated.
 
 
 5
 During the strike, the employer threatened to discharge those employees who failed to return to work. This threat was never carried out, however, and the strike ended two weeks after it began when the strikers reported for duty and were reinstated to their former positions.
 
 
 6
 Throughout this period and afterwards, Mego and Local 807 insisted that the Brentwood employees were included in the preexisting bargaining unit and were covered by the successive collective bargaining agreements. Despite complaints by the employees, representatives of Local 807 visited the Brentwood plant several times to distribute literature and to talk to the employees, and used these occasions to deride the efforts of Local 101 during the strike. Local 101 was denied similar access and protested this disparity without effect. In September, 1979, Local 807 requested, pursuant to the new agreement's union security clause, that Mego discharge all Brentwood employees who had worked for more than thirty days without joining Local 807. Fearful of possible legal repercussions, Mego refused to comply.
 
 
 7
 In response to unfair labor practice charges filed by Local 101, the Regional Director in August, 1979, issued complaints[4] alleging that Mego had violated sections 8(a)(1), (2) and (3) of the Act, 29 U.S.C. §§ 158(a)(1), (2) and (3),[5] and that Local 807 had violated sections 8(b)(1)(A) and 8(b)(2) of the Act, 29 U.S.C. §§ 158(b)(1)(A) and (2),[6] by imposing their collective bargaining agreements on the Brentwood employees when Local 807 did not represent a majority of those workers. In September, 1979, Local 101 filed an election petition with the Regional Director, specifically requesting that he proceed with the election. Denying Local 101's request, the Regional Director, pursuant to section 10(j), see note 2 supra, petitioned the district court for a temporary injunction against Mego's recognizing Local 807 as representative of the Brentwood employees or applying the June 29, 1979 agreement pending final determination of the NLRB proceedings, and for related relief. In February, 1980, after evidence had been taken and while the parties were awaiting the district court's decision, Local 101 requested that all charges pending against Mego and Local 807 be dropped so that an election could be held immediately, but the Regional Director denied this. On February 9, 1980, the district court announced its decision and order which, together with a supplemental order issued on March 3, 1980, granted the injunctive relief sought by the Regional Director. Although the district court's order enjoined the appellants from otherwise applying their collective bargaining agreement to the Brentwood employees, it provided that the wage increases negotiated by Local 807 in 1979, including increases to become effective on July 1, 1980 and July 1, 1981, should remain in effect.
 
 
 8
 Our decisions make clear that the task of a district court in a section 10(j) proceeding is two-fold, requiring a determination "whether there is reasonable cause to believe that unfair labor practices have been committed and, if so, whether the requested relief is 'just and proper.' " Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047 at 1051 (2 Cir. 1980); accord, Seeler v. Trading Port, Inc., 517 F.2d 33 (2 Cir. 1975). On appeal, we are bound by the factual findings of the district court unless these are clearly erroneous, but may fully review its conclusions of law, including findings of reasonable cause. The district court's exercise of discretion in deciding whether injunctive relief is just and proper will be upheld unless it has been abused. Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union, I.L.G.W.U., 494 F.2d 1230, 1244 n.22 (2 Cir. 1974).
 
 
 9
 The validity of the unfair labor practice charges brought in this case turns on the legality of the attempted accretion of the Brentwood employees to the preexisting Bohemia bargaining unit. We have described "accretion" as the "process through which the Board has added new employees to an existing group without holding an election". Westinghouse Electric Corp. v. NLRB, 440 F.2d 7, 11 n.3 (2 Cir.), cert. denied, 404 U.S. 853, 92 S.Ct. 93, 30 L.Ed.2d 93 (1971). Because a finding of accretion works to deny the affected employees the opportunity to vote in a representation election, the Board and the courts have given the accretion doctrine a restricted application. Id. at 11; Sheraton-Kauai Corp. v. NLRB, 429 F.2d 1352, 1354 (9 Cir. 1970). In the words of Judge Goldberg,
 
 
 10
 the Board has traditionally been reluctant to find an accretion, even where the resulting unit would be appropriate, in those cases where a smaller unit, consisting solely of the accreted unit, would also be appropriate and the § 7 rights of the accreted employees would be better preserved by denying the accretion.
 
 
 11
 Boire v. International Brotherhood of Teamsters, 479 F.2d 778, 795 (5 Cir. 1973). Except for this particular reluctance, the factors used by the Board to determine whether an accretion is valid are generally the same as those employed in determining the appropriateness of proposed bargaining units in representation proceedings.
 
 
 12
 In ruling that reasonable cause did exist to support the Regional Director's allegations of unfair labor practices, the district court undertook to weigh a number of factors, including " 'the functional integration of operations; the differences in the types of work and the skills of employees; the extent of centralization of management and supervision, particularly in regard to labor relations, hiring, discipline, and control of day-to-day operations; and the extent of interchange and contact between the groups of employees.' " Kaynard v. Mego Corp., supra, 484 F.Supp. at 172, quoting Peter Kiewit Sons' Co., 231 N.L.R.B. 76, 77 (1977), enforced sub nom., Local 627, International Union of Operating Engineers v. NLRB, 595 F.2d 844 (D.C. Cir. 1979). The court found that all the employees began as new hires at Brentwood and that none were transferred from the Bohemia plants; that the jobs at both locations involved unskilled labor; that there was little interchange or contact between Brentwood and Bohemia employees; that sixty percent of the Brentwood operation concerned the production of rubber-skinned dolls; that the other forty percent of the work done at Brentwood consisted of "pack out" or the assembling and packaging of component parts; that only five percent of the dolls packed out at Brentwood were produced at the Bohemia facilities; that eighty percent of the Brentwood operation was never performed at Bohemia; that prior to July 1, 1979, the Brentwood plant manager hired all the Brentwood employees, and shared responsibility with the plant foreman over job training, transfers, discipline, and overtime pay; and that Mego's vice president in Manhatten was responsible for production at all of the company's plants. Applying the criteria mentioned above to these facts, the district court ruled that Mego's centralized management, the unskilled nature of the tasks performed at both locations, and the functional integration of Mego's operations favored a finding of accretion, whereas the control of day-to-day operations, hiring and discipline by the local Brentwood management and the lack of interchange or contact between the two groups of employees militated against such a result. Accordingly, the district court stated that "the balance of the accretion factors relevant to this case does not decidedly tip in either petitioner's or respondent's (sic) favor." Kaynard v. Mego Corp., supra, 484 F.Supp. at 173. The district court reasoned, however, that a finding of accretion would deny the Brentwood employees the freedom of choice protected by section 7 of the Act, 29 U.S.C. § 157,[7] and concluded from this that reasonable cause existed to support the Regional Director's case. 484 F.Supp. at 173.
 
 
 13
 We are in essential agreement with the district court's conclusion of reasonable cause, although we do not wholly endorse the route by which the district court arrived at that result. If the balance of accretion factors, including the rule as to limited application of the doctrine, were truly in equilibrium, the Regional Director would have failed to demonstrate reasonable cause for believing the accretion invalid. But this could not have been the court's meaning. We prefer to understand the court's invocation of the Section 7 rights of the Brentwood employees as an allusion to the principle that the accretion doctrine should be narrowly applied.[8] In addition, we note that the district court's finding of reasonable cause accords with the rule that the Regional Director's version of the facts should be sustained if within the range of rationality, that inferences from the facts should be drawn in favor of the charging party, and that even on issues of law, "the district court should be hospitable to the views of the General Counsel, however novel." Danielson v. Joint Board, supra, 494 F.2d at 1245. Accord, Danielson v. International Organization of Masters, Mates & Pilots, 521 F.2d 747 (2 Cir. 1975).
 
 
 14
 In order to dispel any doubts remaining on this issue, it may be worthwhile to express our puzzlement over the district court's ruling that the operations of the Bohemia and Brentwood plants were functionally integrated. The district court established that eighty percent of the work performed at Brentwood had never been done at Bohemia and that only five percent of the dolls packed out at Brentwood originated at Bohemia. In addition, the record shows that the raw materials required for rubber-skinned doll production, which comprised sixty percent of the Brentwood operation, were purchased from outside contractors and delivered to the Brentwood plant. The record also contains the testimony of Mego's vice president for production to the effect that production schedules drawn up in his office for the Bohemia and Brentwood plants were separate, and that the scheduling of production at Brentwood had nothing to do with meeting production goals set for Bohemia. In light of these facts, and in light of the rule that the district court should give the benefit of the doubt to the Regional Director, we question whether the mere existence of a corporate officer with some responsibility for overseeing production suffices to support the district court's finding that Mego's Bohemia and Brentwood operations were functionally integrated.
 
 
 15
 Additionally, the district court might well have considered the extent of union organization among the Brentwood employees as a factor favoring the Regional Director's position. The conflicting evidence indicated that at best, Local 807 had managed to solicit only ten authorization cards from the Brentwood employees, in contrast to the uncontested fifty cards received by Local 101, see note 3 supra. Moreover, the district court found that the Brentwood employees manifested their support of Local 101's efforts to represent them while rejecting Local 807 "in demonstrative terms." Kaynard v. Mego Corp., supra, 484 F.Supp. at 174. Although section 9(c)(5) of the Act, 29 U.S.C. § 159(c)(5), prohibits consideration of the extent of organization as a "controlling" factor, the district court may legitimately consider it as one element among others in determining the appropriateness of a suggested bargaining unit. NLRB v. Metropolitan Life Insurance Co., 380 U.S. 438, 441-42, 85 S.Ct. 1061, 1063, 1064, 13 L.Ed.2d 951 (1965); Spartans Industries, Inc. v. NLRB, 406 F.2d 1002, 1005 (5 Cir. 1969).
 
 
 16
 The Regional Director's view of the accretion issue in this case finds ample support in Board precedents, many of which have been enforced by the courts. See Dura Corp., 153 N.L.R.B. 592 (1965), enforced sub nom., Local 620, Allied Industrial Workers v. NLRB, 375 F.2d 707 (6 Cir. 1967); Sheraton-Kauai Corp., 177 N.L.R.B. 25 (1969), enforced, 429 F.2d 1352 (9 Cir. 1970); Security-Columbian Banknote Co., 215 N.L.R.B. 450 (1974), enforced, 541 F.2d 135 (3 Cir. 1976); Peter Kiewit Sons' Co., supra. In Bryan Infants Wear Co., 235 N.L.R.B. 1305 (1978), a case nearly indistinguishable from this one, the Board reasoned:
 
 
 17
 The kind of work and work skills of employees at both locations are similar, but the total operation of each plant remains separate. Although management is centralized at the higher levels, the Bixby plant manager is responsible for day-to-day operations at the Bixby plant. Furthermore, she makes decisions with respect to hiring and discharge independently of corporate management, and she also has authority to establish the wages of new employees under her supervision. Although the corporate vice president visits Bixby on the average of once a week, we do not find this factor sufficient to overcome the indicia of autonomy of the Bixby plant manager, as there is no evidence to indicate that the vice president concerns himself with the day-to-day operations at Bixby. Furthermore, the Bixby plant is some 12 miles distant from the Bryan plant and there is virtually no interchange or contact between Bryan and Bixby employees.
 
 
 18
 Id. at 1306.
 
 
 19
 If, as appellants urge, there are some discordant voices in the chorus of the accretion cases,[9] it is of no moment; the Regional Director is not required to show that an unfair labor practice occurred, or that the precedents governing the case are in perfect harmony, but only that there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals." McLeod v. Business Machine and Office Appliance Mechanics Conference Board, 300 F.2d 237, 242 n.17 (2 Cir. 1962). Unless the district court is convinced that the legal position of the Regional Director is wrong, a view that clearly would be untenable in this case, a finding of reasonable cause must ensue. See Danielson v. International Organization of Masters, Mates and Pilots, supra.
 
 
 20
 On the second issue before it-whether injunctive relief would be just and proper-the district court found the circumstances in this case to be "of sufficient severity to warrant Section 10(j) relief," observing: "In the absence of such relief, the ultimate anomaly in terms of the policies suggested by the Act would occur. A unit of employees would be represented, for the duration of the proceedings before the Board, by a collective bargaining representative that it has refuted in demonstrative terms." Kaynard v. Mego Corp., supra, 484 F.Supp. at 174. The court went on to note that entrenchment of Local 807 at the Brentwood plant would do irreparable harm to Local 101's chances of success in a representation election.
 
 
 21
 We have considerably more difficulty with this portion of the decision than with the first. In McLeod v. Business Machine and Office Appliance Mechanics Conference Board, supra, 300 F.2d at 239-40, this court reviewed the history of congressional opposition to the use of injunctions in labor contests and the narrow role played by the Act's other injunction provision, section 10(l ) (illegal picketing), in the legislative scheme. Our decision in McLeod v. General Electric Co., 366 F.2d 847 (2 Cir. 1966), vacated as moot, 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967), established that general equitable criteria apply to grants of injunctive relief under section 10(j). There we emphasized:
 
 
 22
 It is black-letter law that the issuance of an injunction is an extraordinary remedy indeed. This is especially true in the labor field where Congress by the Norris-LaGuardia Act deprived the federal courts of jurisdiction to issue injunctions in labor disputes .... (S)ection (10(j)) in no way changed the extraordinary nature of the injunctive remedy.
 
 
 23
 Id. at 849. Determining that injunctive relief was improper in the absence of a showing of the necessity of preserving the status quo or of preventing irreparable harm, we reversed the district court's grant of an injunction. Danielson v. Local 275, Laborers International Union, 479 F.2d 1033 (2 Cir. 1973), did not signify a retreat from the stringent standard of General Electric. The court there avoided deciding whether irreparable harm is a necessary condition of a section 10(l ) injunction by finding that a clear showing of substantial and irreparable harm had been made. Finally, our opinion in Danielson v. Joint Board, supra, also a section 10(l ) case, reaffirmed the view that a district court in a proceeding brought under section 10(j) or 10(l ) must act in accordance with the general rules of equity, 494 F.2d at 1242-44.
 
 
 24
 The district court in this case and the Board in its brief argue that Seeler v. Trading Port, Inc., supra, marked a relaxation of the General Electric standard. We disagree. In Trading Port, the employer's alleged antiunion conduct included threats of discharge and other punitive actions if the employees chose the union or went on strike, promises of benefits if they repudiated the union, threats of termination of the enterprise, coercive interrogation as to voting preferences in the approaching election and discriminatory layoffs following a strike that preceded the election. The district court in Trading Port found reasonable cause to believe unfair labor practices had occurred and enjoined the respondent from engaging in further antiunion conduct, but the court declined to issue an order requiring recognition of and bargaining with a union that had never had a bargaining relationship with the employer and had actually lost a representation election. This court reversed, holding that a bargaining order could be a proper remedy in such circumstances, if the unfair labor practices in question were sufficiently serious. Judge Hays, writing for the court, explained that interim relief may be necessary where serious and pervasive unfair labor practices threaten to render the Board's processes "totally ineffective" by precluding a meaningful final remedy. Denying that General Electric, or the irreparable harm standard it embraced, supported the district court's decision not to issue a bargaining order, Judge Hays described the case before him as one involving conduct "flagrantly violative of the Act," and in which
 
 
 25
 further delay may make ... bargaining impossible in the future .... Under these circumstances, the district court has the power to order immediate bargaining to prevent irreparable harm to the union's position in the plant, to the adjudicatory machinery of the NLRB, and to the policy of the Act in favor of the free selection of collective bargaining representatives.
 
 517 F.2d at 39.[10]
 
 26
 We do not perceive any dilution of traditional equitable principles in Trading Port. The Court's characterization of the unfair labor practices as "flagrant" and "egregious", and the reference to the district court's power to prevent irreparable harm, indicate circumstances justifying extraordinary relief.
 
 
 27
 The instant case, unlike Trading Port, presents no flagrant or egregious violations of the Act, but only a tussle among the parties over the proper application of the Board's accretion criteria to the facts at hand. Although we affirm the district court's finding of reasonable cause, and although good faith is no defense to a violation of the Act, International Ladies' Garment Workers' Union v. NLRB, 366 U.S. 731, 739, 81 S.Ct. 1603, 1608, 6 L.Ed.2d 762 (1961), we think that in a proceeding for equitable relief it is proper to note that the facts of this case are consistent with a picture of the respondents as making a good faith effort to comply with their contractual obligations and with the Act. Certainly, if the district judge found it difficult to decide whether the balance of accretion factors favored the Board or the respondents, it is reasonable to suspect that respondents did also. Thus, at least in terms of the nature of the illegal conduct at issue, we are rather skeptical that this case called for the extraordinary remedy of a temporary injunction.
 
 
 28
 The district court also found irreparable harm to Local 101, the charging party. Although it is true that the privileges of incumbency are great, the district court's concern that Local 101's standing with the employees would be eroded by continued recognition of its opponent is somewhat undercut by the court's finding that even after four months of incumbency, the Brentwood employees still had a strong dislike of Local 807. Moreover, the urgency of the situation seems slightly deflated by the Regional Director's repeated denials of the charging party's requests to proceed to an election. Those decisions, which foreclosed the possibility of a quick resolution of the underlying dispute, while concededly within the Regional Director's discretion, see NLRB v. Laborers International Union, 567 F.2d 833, 835-36 (8 Cir. 1977), could properly be weighed in a proceeding for equitable relief.
 
 
 29
 It is not our role, however, to substitute our judgment in these matters for the discretion of the district court. Though this case stretches section 10(j) to its limits, we are not persuaded that the district court abused its discretion by issuing a temporary injunction. The advantages of incumbency are potent indeed and may be corrosive of that free and uncoerced choice which forms the foundation of our system of collective bargaining. See Brown v. Pacific Telephone & Telegraph Co., 218 F.2d 542 (9 Cir. 1954); Dick v. Sinclair Glass Co., 283 F.Supp. 505 (N.D.Ind.1967); Greene v. Mr. Wicke Ltd., 270 F.Supp. 1012 (D.Conn.1967); Greene v. Senco, Inc., 282 F.Supp. 690 (D.Mass.1968); Goldfarb v. Service Motor Freight, Inc., 438 F.Supp. 18 (N.D.N.Y.1977).
 
 
 30
 On the other hand, the issuance of a section 10(j) injunction diminishes whatever incentives for speed the General Counsel and the charging union might otherwise have had, since a considerable portion of the desired relief has already been obtained. Moreover, in the interval between the grant of an injunction and final adjudication by the Board, the rights of the parties will have been determined by a court rather than by the expert agency established by Congress. Here, although the complaint was issued in August, 1979, and the basic injunction on February 9, 1980, hearings before the administrative law judge were not begun until May, 1980, and as of this writing no decision by him has been announced. The Brentwood employees have thus been unrepresented for over a year, with much further delay ahead.
 
 
 31
 Recognizing this problem, the Third Circuit, in Eisenberg v. Hartz Mountain Corp., 519 F.2d 138, 144 (1975) (Hastie, J.), adopted a policy that, "save in the most extraordinary circumstances", a section 10(j) injunction should be limited to six months "for the completion of expedited action by an administrative law judge on the underlying complaint," with power to grant or continue the injunction for not more than an additional six months after the findings and recommendations of the administrative law judge have been entered, and with an additional permissible thirty-day period "upon a showing that administrative action on the underlying controversy seems to be imminent." While we refrain for the present from imposing such an absolute requirement, we urge district judges in this circuit to give serious consideration to the insertion of appropriate time limits in section 10(j) injunctions. While it would be unfair to impose the Hartz Mountain formula on this case at this late date, we do modify the injunction to provide that it shall terminate if the administrative law judge has not rendered a decision by November 10, 1980, or, in the event of an appeal, if a final decision by the Board is not rendered by January 15, 1981. With facts as simple as those here, these periods doubtless err on the side of liberality.
 
 
 32
 As so modified, the order granting the injunction is affirmed.
 
 
 
 *
 Hon. William O. Mehrtens, Senior District Judge for the Southern District of Florida, sitting by designation, participated in the hearing of this appeal. Judge Mehrtens voted substantially in favor of the disposition herein made and was to have written the opinion, but due to his death did not have the opportunity to do so. Accordingly the appeal is being disposed of by the other two judges as provided in Second Circuit Rule § 0.14(b)
 
 
 [1]
 Samet & Wells, Inc., a wholly-owned subsidiary of Mego Corporation, although listed in the caption, does not figure in the events of this case
 
 
 [2]
 Section 10(j) provides:
 The Board shall have power, upon issuance of a complaint ... charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.
 
 
 [3]
 A representative of Local 807 testified to receiving "about ten" union authorization cards during the first month of operations at Brentwood. The Board claimed to have seen only two cards. The district court determined that Local 807 never received cards from a majority of the Brentwood employees
 
 
 [4]
 An unfair labor practice charge filed by Mego alleging that Local 101 had violated § 8(b)(7)(A) of the Act, 29 U.S.C. § 158(b)(7)(A), was dismissed by the Regional Director
 
 
 [5]
 Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of rights guaranteed" in § 7, see note 7 infra. Section 8(a)(2) prohibits the employer from dominating or interfering with the formation or administration of any labor organization or from contributing financial or other support to it. Section 8(a)(3) restrains the employer from encouraging or discouraging membership in any labor organization "by discrimination in regard to hire or tenure of employment or any term or condition of employment."
 
 
 [6]
 Section 8(b)(1)(A) makes it an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of § 7 rights. Section 8(b)(2) prohibits causing or attempting to cause "an employer to discriminate against an employee in violation of" § 8(a)(3)
 
 
 [7]
 Section 7 provides:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities . . . .
 
 
 [8]
 We thus reject the position urged by Mego that the district court erroneously failed to decide the accretion question
 
 
 [9]
 Local 807 relies upon NLRB v. Appleton Electric Co., 296 F.2d 202 (7 Cir. 1961), in which the Board had found a proposed accretion invalid and the court of appeals denied enforcement stating: "The Board's attempt to make illegal the inclusion of prospective employees of after-acquired plants and divisions would seem to be contrary to a basic policy of the Act, to wit: to achieve stability of labor relations." Id. at 206. We think Appleton Electric is distinguishable on its facts, but note, without passing judgment ourselves, that the case has met penetrating criticism by another court of appeals. See Sheraton-Kauai Corp. v. NLRB, supra, 429 F.2d at 1356-57
 
 
 [10]
 The district court in this case noted the citation in Trading Port of opinions from other circuits some of which appear to embody an approach to section 10(j) relief less stringent than this circuit's, e. g., Angle v. Sacks, 382 F.2d 655 (10 Cir. 1967). We reject any implication that use of these citations to support the result in Trading Port was meant to discard the General Electric standard embraced in the immediately preceding text