Sandra **DUNBAR**, Acting Regional Director of the Third Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

**NORTHERN LIGHTS ENTERPRISES, INC., Respondent.**

No. 96–CV–402C(F).

United States District Court, W.D. New York.

Sept. 12, 1996.

National Labor Relations Board (Michael Cooperman, of counsel), Buffalo, NY, for Petitioner.

Hodgson, Russ, Andrews, Woods & Goodyear, L.L.P. (H. Kenneth Schroeder, Jr., of counsel), Buffalo, NY, for Respondent.

## BACKGROUND

CURTIN, District Judge.

Petitioner Sandra Dunbar, Acting Regional Director of the Third Region of the National Labor Relations Board ("NLRB"), brought the present action seeking a preliminary injunction pursuant to section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j). Petitioner issued a complaint and notice of hearing against respondent on May 21, 1996, alleging that respondent committed unfair labor practices in violation of sections 8(a)(1) and 8(a)(3) of the Act, which prohibit employers from firing an employee in order to discourage membership in a labor organization. 29 U.S.C. § 158(a)(1), (3). Petitioner seeks the injunctive relief pending a final disposition of the underlying complaint.

Specifically, petitioner asks this court to order that Brenda Kinnicutt, a former employee of the respondent Northern Lights Enterprises and a union organizer, be reinstated to her former position, and that all disciplinary warnings filed against Kinnicutt be expunged and not relied on to terminate her, pending a final disposition of petitioner's complaint. The petition also asks the court to order defendant to post a notice of its decision, and to enjoin defendant from any activity intended to impede the organization of a union pending final disposition of the complaint. Item 1. A hearing was held before the court on July 15 and 16, 1996. Page references are to the transcript of that hearing.

Respondent Northern Lights Enterprises is a manufacturer of wax candles and sculptures. The company has grown rapidly over the past few years, growing from approximately 50 employees to 200 employees in the last eighteen months. Tr. 458–59. The company's operations are conducted from four buildings in Wellsville, New York. Brenda Kinnicutt worked in the Central Tractor ("CT") building, where approximately 80 production employees manufacture candles by hand. Tr. 5.

Brenda Kinnicutt was hired by the company as a candlemaker in July, 1995, and was promoted to the position of critiquer (inspector) in September, 1995. Tr. 151. The critiquer position involved a raise in salary, and in late December, 1995, she received a "Moving Up" award from Andrew Glanzman, the president and founder of the company. Tr. 190. In late January or early February, 1996, Kinnicutt began as a critiquer on the Hypno–Glow line in the CT building. Tr. 197.

As a critiquer, Kinnicutt was responsible for inspecting the finished candles of candlemakers on the production line to ensure they were of acceptable quality, or "firsts." Any candles that were too small, too large, cracked, scratched, or displayed other defects were considered seconds or "malls," a term which referred to the fact that damaged candles were sold at discount prices in mall stores. Tr. 326. Candlemakers are compensated on a piece-work basis, receiving compensation for each candle produced. Each candlemaker also has a daily production quota. Candlemakers receive reduced compensation for each "malled" candle, and "malled" candles are not counted toward daily production quotas. Tr. 324.

In December 1995, company managers announced to all critiquers that they were not to help candlemakers fix their candles. Tr. 17. The warning was given because if critiquers fix the candlemakers' candles, "they're actually making candles for them, and increasing the candlemakers' pay." Tr. 18. Kinnicutt was given a verbal warning by Alinda Bledsoe for violating this rule in December 1995. Tr. 19. Bledsoe was Kinnicutt's direct superior. Tr. 19. Other than the verbal warning, Kinnicutt had no disciplinary problems prior to February 1996. Tr. 23.

Kinnicutt testified that although she understood that it was against company policy to help candlemakers fix candles, she did so because she could see how hard some people were working, and that with some minor help from her it was easier for them to make rate. Tr. 158. Some candlemakers, however, allegedly complained to management that in the process of helping them, Kinnicutt was also letting scrapings fall on their candles, and actually creating work for them. Tr. 18.

Late in January 1996, Barbara Gilligan, production manager of the CT building, and Theresa Shaughnessy, the company's overall production manager, held a meeting in the CT building and instructed critiquers that they had to critique more strictly, as too many defects were being overlooked and were being caught by shippers packaging the candles. Tr. 156. Kinnicutt testified that she was already considered stricter than some other critiquers. Tr. 157. In response to this meeting, she told some candlemakers that if she was going to be required to be still stricter, she was going to be the critiquer from hell. Tr. 157.

On January 29, 1996, Kinnicutt tendered a written resignation effective February 9, 1996. Tr. 410. The letter stated that an intolerably high stress level at work and problems at home were the reasons she was quitting. The letter also conveyed a generally positive attitude about her experience at the company. Plaintiff's Ex. 1. Shortly after tendering her resignation, Kinnicutt changed her mind; and on February 5, 1996, she asked Shaughnessy if she could rescind her resignation, and if Shaughnessy would give her a raise. Tr. 164. Shaughnessy consented on both grounds. Tr. 411; 164.

Gilligan testified that immediately after Kinnicutt tendered her resignation, she began to notice that Kinnicutt was talking to candlemakers in other areas when she should have been concentrating on candlemakers on the Hypno–Glow candle line for which she was responsible as a critiquer. Tr. 369. Gilligan testified that Kinnicutt spent an "exorbitant" amount of time in other areas of the production floor, and also spent a lot of time fixing candlemakers' candles, in contravention of company policy. Tr. 381. Gilligan stated that she spoke to Kinnicutt on several occasions about fixing candles. Tr. 381.

On February 13, 1996, Kinnicutt met with Robert Cole, business representative of the International Association of Machinists and Aerospace Workers, District 6. Tr. 47. Cole is responsible for organizing unions in Allegany County where Wellsville is located. Tr. 47. Kinnicutt approached Cole to ask him about what a union might do for employees of Northern Lights. Tr. 48. Cole testified that Kinnicutt had already assembled a list of some coworkers who were interested in a union. Tr. 49. Kinnicutt said that she could get more names, and so the two decided to hold a meeting on February 20, in order to give her time to speak to additional workers. Tr. 50–51. On February 20, Kinnicutt contacted Cole with additional names gathered by Brenda Snyder, who worked in a different building. Tr. 78; 103. According to the two

lists introduced into evidence at trial, a total of 31 people had, at some point, expressed interest in the union. Plaintiff's Exs. 2, 3.

As word of the union meeting spread during the week following the initial meeting, candlemakers began to come to Gilligan to say that they did not want to belong to a union. Tr. 379. They informed Gilligan that Kinnicutt was compiling a list of those who were interested in the union, but that they wanted their names off the list. Tr. 379. In response, Gilligan wrote at the top of a piece of paper "Has come & seen me & talked to me (union) no involvement, wants nothing to do with it, did not sign petition." Plaintiff's Ex. 13; Tr. 385. Employees came in and signed the list on February 15, 16 and 19. Tr. 386. Eleven employees signed the list. Plaintiff's Ex. 13. Of those signing the list, only Judy Mitchell and Yvonne Cornelius also appeared on the list of potential union supporters.

Soon after the first meeting between Kinnicutt and Cole, Gilligan was informed by another manager that some employees were trying to form a union. Tr. 378. Gilligan then informed Shaughnessy of this activity. Tr. 378. Although Gilligan testified only to vague knowledge of union activity, Shaughnessy testified that a day or two after Gilligan told her of the activity, Shaughnessy knew that there was an organizational meeting planned for the following week, and that Brenda Kinnicutt was circulating a list for interested employees. Tr. 412–413. At the same time, a day or two following her conversation with Gilligan, Shaughnessy informed Tina Glanzman, Northern Lights vice-president, that there was to be a union organizational meeting. Tr. 412. On Monday, February 19, Tina Glanzman notified her husband, Andrew Glanzman, the president of Northern Lights, of the union activity in the context of a broad general telephone discussion about the business. Tr. 451. Andrew Glanzman was in New York City at the time of the telephone conversation.

During the same telephone call on February 19, Andrew Glanzman also spoke to creative director Nancy Meyers. Tr. 452. Meyers suggested to Glanzman that she draft a letter to employees addressing the issue of union organization. Tr. 452. Meyers then drafted the letter, and read it to Glanzman over the phone later that day. Tr. 454. Glanzman made some changes, and the letter was prepared and circulated to all employees on that day. Tr. 455; Plaintiff's Ex. 5. The letter highlights some of the company's positive attributes, such as good pay and a profit sharing plan. The letter also asks employees rhetorically, "[w]hat would be gained" by a union?

Bledsoe testified that on the morning of February 19, she reported complaints made by candlemakers against Kinnicutt to CT building supervisor Barbara Gilligan. Tr. 336. Bledsoe testified that she spoke to Gilligan about the problem, and that Gilligan told her to give Kinnicutt a written reprimand. Tr. 336. Due to the press of work, Bledsoe did not show the "write-up" to Kinnicutt until the next day. Tr. 336. The written reprimand dated February 19 does not mention any threats or excessive malling. Instead, it mentions only that Kinnicutt "must start critiquing more people," and that she should not help candlemakers fix their candles. Plaintiff's Ex. 7.

Specifically, the candlemakers allegedly complained to Bledsoe and Gilligan that Kinnicutt was improperly "malling" candles that were not defective. Tr. 366. Gilligan testified that these complaints came primarily from Amy Taylor (now Amy Slack), Yvonne Cornelius, Kathy Strawcutter, Tammy Tanner and Missy Gough. Tr. 366–67. Shaughnessy testified that the alleged threats set the tone that ultimately caused her to fire Kinnicutt on February 20. Tr. 415–18.

Amy Slack, a candlemaker, testified at trial that she complained to Bledsoe because on the day she told Kinnicutt that she was not interested in the union, Kinnicutt insinuated that she would more harshly critique Slack's candles. Slack testified that Kinnicutt then malled 50 of Slack's candles, although Slack had never had more than "five or seven" malls on an average day. Tr. 251–52. On cross-examination, Slack conceded that for the week ending February 3, 1996, she had 33 malls on Thursday and 30 malls on Friday. Tr. 259.

Judy Mitchell testified that on the day she informed Kinnicutt that she wanted no part in the union, Kinnicutt told her that "[s]he [Kinnicutt] could be the mall queen and she hadn't critiqued my [Mitchell's] candles yet." Tr. 264. Mitchell testified that on that day, Kinnicutt classified 52 of her candles as malls. Tr. 265. Mitchell then went to Bledsoe and asked her to recheck the candles, and according to Mitchell, Bledsoe found "very few malls" upon her reinspection. Tr. 265. At the end of that week, Mitchell was suspended for her high number of malls. Although Bledsoe's reinspection allegedly uncovered far fewer malls, the suspension was never rescinded by the company. Tr. 267.

Finally, Katherine Strawcutter testified that on February 19, when she refused to return Kinnicutt's calls concerning the union, Kinnicutt malled 50 of her candles. Tr. 284. According to Kinnicutt, Bledsoe's reinspection turned up "[p]robably about twenty" malls. Tr. 286. Mitchell also testified that prior to that, Kinnicutt had intentionally "smushed" her candles by leaning a clipboard on them. Tr. 286. Strawcutter also testified that she had been terminated in May for failing to make enough candles, but had been reinstated by the company two weeks before her appearance at trial. Tr. 294. Strawcutter also testified that the critiquing of her work was "a lot easier" since she returned to the company. Tr. 295.

On the morning of February 20, Bledsoe testified that a meeting was held at which she, Gilligan, and Kinnicutt were present. Bledsoe testified that she presented Kinnicutt with the written reprimand, and told Kinnicutt that she had to critique more people and needed to make sure "malls were malls." Tr. 337. According to Bledsoe, the meeting was conducted in a calm fashion, and Kinnicutt did not appear upset. Tr. 344.

Kinnicutt testified that after being written up, she first inspected the work of "a couple of other candlemakers" and then turned to the work of Yvonne Cornelius. As Kinnicutt separated the candles that had to be fixed from the others, Cornelius told Kinnicutt that she did not have to put up with Kinnicutt's crap, and that Kinnicutt was malling her candles due to her anger at being written up. Kinnicutt testified that she responded that Cornelius was angry because Kinnicutt could no longer help her fix her candles. Tr. pp. 177–78. Kinnicutt conceded that Cornelius had "quite a lot" of malled candles. Tr. p. 179.

Alinda Bledsoe then arrived on the scene. Bledsoe testified that Cornelius approached her and told her that Kinnicutt stated that if the candlemakers thought Kinnicutt was a bitch before, now she was going to be a bitch from hell. Bledsoe further testified that Kinnicutt was malling more candles of Cornelius than she should have, and that Cornelius stated that she would take no more of Kinnicutt's crap and was going to quit. Tr. p. 339. Bledsoe never asked Kinnicutt whether she had, in fact, threatened Cornelius. Tr. 350. Instead, Bledsoe went to talk to Barbara Gilligan. Tr. 339.

Gilligan testified that Bledsoe came to her and told her that Cornelius was upset, and that she was quitting. Gilligan told Bledsoe to calm Cornelius down, and Gilligan telephoned Shaughnessy. Gilligan then went to Shaughnessy's office. Tr. p. 374.

Shaughnessy testified that she was first notified by Gilligan that Kinnicutt was malling excessive numbers of candles about ten days prior to Kinnicutt's termination. Tr. 405. Shaughnessy testified that when she first heard the complaints, she did not give them much attention, because there had been talk of union organization some years before and nothing came of it. Tr. 403. In addition, Shaughnessy assumed that "some of the candlemakers just might be disgruntled for some reason." Tr. 406. However, when Gilligan again informed Shaughnessy about the complaints of alleged threats on the morning of February 20, and the specifics of the Cornelius incident, Shaughnessy became angry, as she felt that type of behavior was unacceptable for a critiquer. Tr. p. 417.

Shaughnessy then went to the CT building, and told Kinnicutt she wanted to talk to her. As they approached the office, Bledsoe was in the room, but stated that she did not want to be there when Shaughnessy confronted Kinnicutt. Instead, Lynnie Bartoo remained in the office as a witness to the meeting. Tr.

p. 417. Shaughnessy then told Kinnicutt that she heard she had been written up, and that she was upset. Kinnicutt then stated that she had been written up, but had not been upset. According to Shaughnessy:

I had asked her, you mean you didn't make any threatening comments to anyone, and she denied that. And so after she denied it I didn't think I should pursue it any longer and so I said, well, under New York State law I do not have to tell you why I am firing you, you're denying that you threatened anyone, but you were written up this morning for fixing candles, that you shouldn't be, for wandering around, for not doing as much work as you should, these are some of the reasons I'm letting you go.

Tr. p. 418.

Although Shaughnessy stated to Kinnicutt that the contents of the write-up were the reason for the termination, she stated at trial that the alleged threats were the actual reason, and that she believed the candlemakers and disbelieved Kinnicutt. Tr. 418.

After terminating Kinnicutt, Shaughnessy announced the termination on the production floor and announced that Kinnicutt was not permitted on any of the facilities. Tr. 12. Shaughnessy had never publicly announced a termination before, and testified that she did so on this occasion in order to allay the anxieties of the candlemakers who had allegedly been harassed and abused by Kinnicutt. Tr. 15.

In the evening of the same day, February 20, an informational meeting was held by Cole at the local VFW post. Tr. 420. Eight employees signed a sign-in list. Plaintiff's Ex. 4. Several other employees who attended the meeting, including Ryan and Melissa Gough, and Theresa Shaughnessy, did not sign the list. Shaughnessy attended the meeting, claiming that she believed that the union would represent management employees as well as line workers. Tr. 420. Within a short time of her arrival, Cole approached her and asked her to leave, stating that it was his meeting, and that he did not want supervisors to attend. Tr. 425. Shaughnessy asked other employees for a show of hands indicating whether they wanted her to leave. Tr. 426. Cole, however, insisted that

he would not start the meeting unless Shaughnessy left, and Shaughnessy ultimately complied. Tr. 426.

## DISCUSSION

The National Labor Relations Act, section 10(j), provides:

The [National Labor Relations] Board shall have the power, upon issuance of a complaint ... charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred ..., for appropriate temporary relief or restraining order. Upon the filing of any such petition the court ... shall have jurisdiction to grant the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j)

In a proceeding in district court for an injunction pursuant to § 10(j) of the Act the Board must demonstrate *both* that (1) there is reasonable cause to believe that an unfair labor practice has been committed and, if so, that (2) granting injunctive relief pending the outcome of administrative proceedings before the Board is "just and proper." *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir.1980).

The standard of review governing the NLRB's burden of demonstrating the existence of reasonable cause to issue a section 10(J) injunction is a deferential one. Reasonable cause, for section 10(J) purposes, exists when the Regional Director "has come forward with evidence sufficient to spell out a likelihood of [a] violation." *Danielson v. Joint Bd. of Coat, Suit, & Allied Garment Workers' Union*, 494 F.2d 1230, 1243 (2d Cir.1974) (citation omitted). The district court need not find that "an unfair labor practice occurred, or that the precedents governing the case are in perfect harmony, but only that there is 'reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals.'" *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1033 (2d Cir.1980)

(Friendly, J.) (quoting *McLeod v. Business Machine and Office Appliance Mechanics Conference Board,* 300 F.2d 237, 242, n. 17 (2d Cir.1962)).

■ Where there are disputed issues of fact, the Regional Director is entitled to assume facts and draw inferences in favor of the charging party, and, as long as his choice is rationally based and the court is not convinced that the Board's legal position is wrong, the court must sustain those findings and grant injunctive relief. *Danielson v. International Org. of Masters, Mates and Pilots,* 521 F.2d 747, 751 (2d Cir.1975).

■ On the other hand, the fact that an employee is engaged in some form of union organizing activity close to the time that the employee is terminated from employment does not of itself prohibit or otherwise affect the right of an employer to discharge an employee. *NLRB v. Loy Food Stores, Inc.,* 697 F.2d 798, 801 (7th Cir.1983). An employer may discharge an employee for poor performance, insubordination, or any other legitimate reason, even if the employee is engaged in some form of union activity at the time. *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 45–46, 57 S.Ct. 615, 628–29, 81 L.Ed. 893 (1937).

■ The Second Circuit has also recognized that the grant of an injunction pursuant to section 10(j) of the Act is an extraordinary remedy. *McLeod v. General Electric Company,* 366 F.2d 847, 849 (2d Cir.1966). It is only "just and proper" to grant injunctive relief when the petitioner has demonstrated that there is a compelling necessity to preserve the status quo or prevent irreparable harm, such as in the case of flagrant or continuing violations of the Act. *Mego Corp.,* 633 F.2d 1026 (2d Cir.1980).

**I. There is reasonable cause to believe that an unfair labor practice has been committed.**

Respondent argues that petitioner's cause of action must fail because it was justified in terminating Kinnicutt. Respondent's Memorandum of Law, p. 10. Specifically, respondent points out that Kinnicutt received warnings of her deficient work performances, "and was terminated only after she once again was abusive and harassing to other employees following her receipt of a written warning." *Id.* According to respondent, there is no reasonable cause to believe that the company committed an improper practice under the act when it terminated Kinnicutt.

The court disagrees, first noting that respondent's stated justification for terminating Kinnicutt does not survive close scrutiny. First, although Theresa Shaughnessy testified that her principal reason for terminating Kinnicutt was that Kinnicutt was harassing candlemakers, that reason does not appear on the written warning issued on February 19. In addition, Shaughnessy testified that when she first heard the reports of threats she did not play close attention. Tr. 403. But when the alleged threats to Yvonne Cornelius were brought to her attention on the eve of the union meeting, she became angry. Tr. 417. Although the reports angered her, she terminated Kinnicutt without making even a perfunctory inquiry into whether the allegations were true. Tr. 418. In the face of Kinnicutt's denial of the allegations, neither Shaughnessy, nor Bledsoe, nor Gilligan made any serious inquiry of either Cornelius or her coworkers as to the specifics of the alleged incident. Tr. 350, 374, 418.

In addition, the reports of alleged harassment through excessive malling of candles by Kinnicutt are also difficult to credit. Amy Slack testified that Kinnicutt malled 50 of her candles, although she had never had more than "five or seven" malls on an average day. Tr. 251–52. Slack later conceded that for the week ending February 3, 1996, she had 33 malls on Thursday and 30 malls on Friday. Tr. 259. Thus, while Kinnicutt may have malled somewhat more candles than average on the day of the complaint, it was not a dramatic increase over Slack's usual rate of defective candles. Similarly, Judy Mitchell testified that when she notified Bledsoe of excessive malls by Kinnicutt, Bledsoe rechecked the candles, and according to Mitchell, Bledsoe found "very few malls." But Mitchell was suspended at the end of the week due to her high number of malls, and the suspension was never rescinded by the company. Tr. 267. The least

persuasive testimony was that of Katherine Strawcutter, who was terminated in May 1996 for failing to make enough candles, but had been reinstated by the company two weeks before her appearance at trial. Tr. 294. Under the circumstances, the court is not surprised by Strawcutter's testimony that the critiquing of her work was "a lot easier" since she returned to the company. Tr. 295.

Nor does the court credit the testimony of Andrew Glanzman that he was indifferent to the formation of a union, and knew nothing about what union representation of workers might mean to the operation of his business. Tr. 460. It would seem that any person engaged in business in the United States would have some vague idea about the sometimes adversarial relationship between a union and management, and about the loss of autonomy that a company's management often suffers under a collective bargaining agreement. In Glanzman's case, his total lack of knowledge is yet more striking because there were at least rumors that the workers in his company were thinking of striking five years before. Tr. 403. Rather, Glanzman's letter to his employees is at least some evidence that he understood what a union would do, and that he did not welcome the organization of the workers at Northern Lights. In addition, the fact that some employees were eager to report their opposition to the union to company management, and sign a list to that effect maintained by their supervisor, in some cases after expressing interest in the union, is evidence that management's attitude toward a union was not entirely benign.

The court is persuaded by the timing of the disciplinary actions against Kinnicutt, which became more frequent and severe at precisely the moment that management learned of Kinnicutt's role in trying to organize her coworkers. It is notable that although Kinnicutt had received a verbal warning in December 1995, Shaughnessy was untroubled by this, and was willing to allow Kinnicutt to rescind her resignation in early February 1996, before Shaughnessy had heard any reports of union activity. Tr. 412.

■ As soon as Kinnicutt began to collect the names of her coworkers, managers began to notice her wandering away from her station, and reports of excessive malling and abuse of candlemakers were made to managers. The court acknowledges that these reports and complaints may have been a result of Kinnicutt's focus on her organization efforts, rather than her work. But even though Kinnicutt's "wandering" and fixing of candles are the proffered justifications for her termination, that does not preclude the court from looking at the totality of the circumstances in order to determine whether she was in fact fired in order to chill union activity.

■ The court finds that the evidence produced by the petitioner, coupled with the weaknesses and inconsistencies in the testimony of respondent's witnesses and the timing of the disciplinary actions against Kinnicutt, lead to a conclusion that there is reasonable cause to believe that a violation of the National Labor Relations Act was committed, and that Kinnicutt was fired in order to halt union activity at Northern Lights.

## II. The requested injunctive relief is "just and proper."

Respondent argues that petitioner's own actions show that there is no compelling "necessity of preserving the status quo or preventing irreparable harm," *Kaynard,* 633 F.2d 1026, 1033, because petitioner did not file its petition for an injunction until more than four months after the filing of its original complaint. Item Respondent's Memorandum of Law, p. 15. Respondent further argues that injunctive relief is not just and proper because there is "no evidence whatsoever of anti-union animus other than supposition and conjecture." *Id.*

Petitioner counters that Brenda Kinnicutt was the key union organizer at Northern Lights, and that her termination will therefore have a severe chilling effect on any organization efforts. Petitioner argues persuasively that if no injunctive relief is granted, any action by the NLRB several months from now will be a hollow administrative

formality. Petitioner also points out that the complaint was issued on May 21, and that the NLRB then conducted an investigation into the facts of the case before filing the present action. Tr. 240. This investigation accounts for the delay.

 The court agrees with the petitioner that such delay is entirely reasonable, and does not demonstrate any lack of "compelling necessity to preserve the status quo." Moreover, "[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper. Delay is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief." *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir.1988).

More importantly, the court finds a compelling need to restore the status quo pending a final disposition of the NLRB's complaint. Although there is no direct evidence that Northern Lights management sought to quash union activity by firing Kinnicutt, there is significant circumstantial evidence to support that conclusion. First, as stated above, the respondent's proffered reasons for the termination do not stand up to close scrutiny. Second, the fact that candlemakers felt compelled to sign a list, kept by their supervisor, indicating that they were not interested in the union, clearly demonstrates that management was hostile to the organization campaign and the workers knew it. Finally, it is difficult to believe that Theresa Shaughnessy attended the union organizational meeting with an eye toward union membership. Far more likely is the petitioner's assertion that her intent was to gather information about the union in order to make a report to the Glanzmans.

In light of this evidence, the court concludes that *if the injunctive relief is not granted, the ability of workers to organize will be significantly injured* pending a final determination by the NLRB, which may take another several months.

## CONCLUSION

For the foregoing reasons, petitioner's prayer for injunctive relief is granted. Respondent is ordered to reinstate Brenda Kinnicutt to her position as a critiquer pending a final determination of the Board. Respondent is ordered not to use any currently existing disciplinary reports as a basis for Kinnicutt's termination pending a final determination of the Board. In order to ensure that employees of Northern Lights have access to the text of this decision, respondent is ordered to post a copy in all locations where general notices to employees are posted. Finally, respondent is ordered to desist from any activities intended to frustrate union organization efforts at Northern Lights.

So ordered.