Sandra DUNBAR, Regional Director of the Third Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

COLONY LIQUOR AND WINE DISTRIBUTORS, L.L.C., Respondent.

No. 98–CV–0034.

United States District Court, N.D. New York.

July 30, 1998.

National Labor, Relations Board (Robert A. Ellison, of counsel), Albany, NY, for petitioner.

DeGraff, Foy, Holt–Harris & Kunz, LLP (Glen P. Doherty, of counsel), Albany, NY, for respondent.

## MEMORANDUM, DECISION & ORDER

McAVOY, Chief Judge.

This is a petition for injunctive relief brought by Sandra Dunbar ("petitioner"), Regional Director of the Third Region of the National Labor Relations Board ("NLRB" or "the Board"), on behalf of the Board, pursuant to the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 160(j). Respondent Colony Liquor and Wine Distributors, L.L.C. ("Colony") opposes the petition.

## I. Background

The following facts are drawn from the record of the administrative hearing before Administrative Law Judge Michael A. Marcionese ("ALJ"). Colony is a New York limited liability corporation engaged in the wholesale distribution of liquor and wine. Transcript of Administrative Proceeding (hereinafter "Tr.") at 28–29. Its principal place of business is in Kingston, New York. As of June of 1997, Colony also had offices in Albany, Syracuse, Rochester and Buffalo.

As of June of 1997, Colony had three facilities in the Albany area. One facility, located in Menands, New York, had been an original Colony facility. The other two, in the City of Albany, were acquired through Colony's merger in September of 1996 with a company called Peerless Mohawk. Tr. at 77. After the merger, all three of the Albany facilities (hereinafter "the Albany facility") remained

in operation through a portion of 1997. Prior to the merger, employees at both the Colony and Peerless locations in Albany were represented by Local 669, International Brotherhood of Teamsters, AFL–CIO (hereinafter "the Union"). After the merger, the Union, on behalf of the employees at the Albany facility, entered into a collective bargaining agreement ("CBA") with Colony. Id.; GC–9[1]. As of 1996 and throughout 1997, none of Colony's Kingston employees were represented by a union. Tr. at 78.

At least as early as 1997, Colony began exploring the possibility of expanding its Kingston facility. See GC–3. Colony employee and Union Shop Steward Gary Brown testified that in February of 1997, Colony supervisor John Dowdell told him that Colony would probably be leaving the Albany area. Tr. at 328. Specifically, Dowdell indicated that "there was a good possibility that the business would be going to Kingston and [the Albany employees] wouldn't necessarily be going with it." Id. at 328. Dowdell asked that Brown keep the information confidential. Id. Throughout the first half of 1997, however, Colony management was denying to its employees that the Albany facility would be relocated to Kingston. Tr. at 398–400; 550–52. Colony began construction of the expanded Kingston facility in April of 1997. GC–32; Tr. at 91.

In March or April of 1997, Irving Wood, principal executive officer of the Union, became aware of rumors circulating among the shop stewards that Colony was relocating its Albany facility to Kingston. Tr. at 110. Sometime in May of 1997, Wood contacted Donald Jost, Colony's Director of Operations, and asked "what was going on" with the Kingston expansion. Tr. at 112. Jost told Wood that no decision had been made on what positions would be transferred to Kingston, and left open the possibility that at least the Menands site would remain in operation. Id. at 112–13. On May 19, 1997, Wood sent a letter to Colony's President, James Andretta III, asking (1) whether Colony had plans to move the Albany facility to

**1.** The Court retains the designations the parties attached to the exhibits offered at the administrative hearing. Thus, petitioner's exhibits are des-

ignated "GC" (General Counsel), respondent's as "R," and the Union's as "CP" (Charging Party).

another location; (2) if so, when the move was planned and to what location; and (3) what the reasons for the relocation were. GC–10. Wood did not receive a response to the letter. Tr. at 116. He sent a follow-up letter on June 2, 1997 requesting the same information, and again received no response from Colony. GC–11.

On June 11 and 13, 1997, Colony sent notices to the Albany employees, pursuant to the Worker Adjustment and Retraining Notification Act ("WARN"), that Colony intended to cease operations at the Albany facility as of August 15, 1997, at which time their employment would be permanently terminated. GC–12, 13. The notices also indicated that no "bumping rights" currently existed. GC–13. No notification was given to the Union at that time, but Wood was given copies of the WARN Act notices by one of the stewards. Tr. at 119–20. After reviewing the notices, Colony employee and Union Shop Steward Robert F. Haight asked Dowdell (1) for clarification of the "bumping rights" reference; (2) whether the Union had been notified; and (3) if the Albany facility employees covered by the CBA (hereinafter the "bargaining unit employees") would be employed in Kingston. Tr. at 401. Dowdell did not respond.

Meantime, Wood had still not received a response to his letters of May 19 and June 2. On June 16, 1997, the Union submitted various grievances in an attempt to keep the Albany facility open or to require Colony to transfer the bargaining unit employees to Kingston. On June 17, 1997, Wood wrote Andretta requesting that Colony meet with the Union to discuss the decision to cease operations at the Albany facility. GC–14. Specifically, the Union wanted to discuss: (1) the impact of the closing on the bargaining unit employees; (2) the application of the Albany CBA to Colony operations in other facilities; and (3) Colony's obligation to continue employment of the bargaining unit employees at another location. The same day, the Union filed its original charge with the Board. *See* GC–1a. The charge alleged that since May 19, 1997, Colony had refused to bargain in good faith with the Union by, *inter alia*, refusing to furnish information on the relocation. *Id.*

On June 20, 1997, the Union submitted an intention to arbitrate the grievances with the New York State Employment Relations Board. GC–15. On June 23, Wood again wrote Andretta, this time asserting that Colony's termination of the bargaining unit employees would violate several provisions of the CBA. GC–16. On June 27, 1997, Colony sent letters to Wood and Union President Ozzi Martucci, providing written notice, pursuant to the WARN Act, of Colony's intention to permanently close the Albany facility as of August 15, 1997. GC–17a–b. The letters indicated that a total of 57 employees would be affected, including bargaining unit employees. *Id.* Moreover, Colony began hiring for the expanded facility by the end of June. Tr. at 48, 678–79.

On July 14, 1997, after a meeting with the bargaining unit employees, the Union informed Colony that 41 bargaining unit employees were "ready, willing and able to be relocated to [Colony's] Kingston operation and becoming [sic] employed there when and if [Colony] relocate[d][its] present Albany County operation." GC–19. Wood wrote Andretta again the next day, iterating his request to meet with Colony and discuss the decision to relocate, its effect on the employees and the application of the CBA to Kingston. GC–20.

Between July 17 and 20, 1997, both Colony's counsel, Glen P. Doherty, and NLRB Field Examiner, Barnett L. Horowitz, contacted the office of Union counsel Dominick P. Tocci indicating that Colony was willing to schedule dates to bargain over the effects of the relocation. Tr. at 698–701; R–13; R–2. On July 21, 1997, Tocci contacted Doherty and the parties agreed to meet on July 24, 1997.

Present at the July 24, 1997 meeting were Jost and Doherty for Colony, and Wood, Tocci and Union Stewards Bob Vickers, Bob Haight and Gary Brown for the Union. During the meeting, Colony explained that the relocation essentially was a cost-saving measure, and that it had hired 55 employees to fill the new positions in Kingston. Tr. at 145. The Union took the position that the bargaining unit employees had the right to be transferred to Kingston. *Id.* at 146. Doherty

countered that he didn't believe the bargaining unit employees had a right to the Kingston positions, and that Colony's only obligation was to bargain over effects such as severance pay. *Id.* at 146, 704–05; R–17.

Doherty also testified at the hearing that Tocci's position was that Colony was required to bargain over the *decision* to relocate to Kingston, or "at a minimum, the entire work force goes to Kingston at current terms." Tr. at 705. Doherty also testified that Tocci asserted that the Union would not bargain over effects until the NLRB, a court or an arbitrator ruled on Colony's obligation to bargain over the relocation decision. *Id.*[2] In an affidavit sworn to July 31, 1997, Wood stated that the Union, at the July 24 meeting, took the position that it would like to *reserve* its right to bargain over effects until the NLRB and arbitration actions were finalized. R–5 ¶ 7. Tocci himself testified that he suggested only that effects bargaining be "put off" for a little while due to the pendency of the NLRB matter and state arbitration proceeding. Tr. at 588.

The following day, Doherty sent Tocci a letter by fax. The letter stated:

> I am writing as a follow-up to yesterday's bargaining session during which you stated that your client, Local Union No. 669, was unwilling to bargain over "effects" due to your position that Colony was and is required to bargain over its decision to relocate certain work performed at [the Albany] facility. I believe that your position is contrary to the holding of *Dubuque Packing Company,* and as I advised you, inasmuch as Colony's relocation is currently in progress, the Union's refusal to bargain over "effects" compromises Colony's ability to bargain in good faith over the issue. Please be advised that Colony is ready, willing and able to bargain over "effects."

GC–22. Tocci responded as follows in a letter to Doherty dated July 28, 1998:

> Please be advised that Local 669 is prepared to meet with you and Colony representatives over "effects" of Colony's decision to relocate.

Prior to doing so we request written responses to our letters of May 19, 1997, June 17, 1997, July 14, 1997 and July 15, 1997, which responses were promised us at our meeting of July 24, 1997, together with a copy of your "relocation consultant's" report.

This agreement to meet in reference to "effects" is without prejudice to our filing of unfair labor practices with the NLRB and our demand for arbitration.

I trust that I will receive the above materials soon so that we can set some dates for bargaining sessions.

GC–23.

Doherty responded in a letter dated July 29, 1997. Therein, he informed Tocci that, as indicated in the June 13, 1997 WARN Act notices, closure of the Albany facility would begin August 15, 1997. He also responded to the Union's prior requests for information by explaining the reasons for the relocation, including (1) the installation of new technology and infusion of new capital at the Kingston facility; (2) the out-dated equipment at the Albany facility; (3) the proximity of the Kingston facility to a large portion of Colony's market; and (4) tax incentives available at Kingston.

Tocci and Doherty spoke by telephone on July 30, 1997. At that time, Tocci advised Doherty that the Union proposed that the bargaining unit employees be transferred to Kingston in order of seniority and that their seniority be dovetailed with that of the Kingston employees. Tr. at 591, 709. Those employees who were not transferred would receive two weeks severance pay per year of employment plus additional benefits under the proposal. Tr. at 709.

The Union filed an amended charge with the NLRB on August 1, 1997. In the amended charge, the Union alleged (1) that Colony discriminated against the bargaining unit employees on the basis of their Union membership by refusing to transfer them to Kingston; and (2) that Colony continued to refuse to bargain in good faith over the decision to relocate, the effects of the decision, and by

---

**2.** At the end of the session, Tocci served papers on Doherty with respect to a motion to compel arbitration in the state court matter. Tr. at 591, 705.

refusing to furnish the Union with information regarding the decision. GC–1(b).

Doherty provided Tocci a copy of the consultant's report on August 12, 1997, and requested that Tocci contact him to schedule bargaining dates. R–21. On August 15, 1997 the two men spoke over the telephone. Doherty asserts that during this conversation, he informed Tocci that in the coming week, Colony planned to offer positions to approximately fourteen bargaining unit employees. Tr. at 712; R–23. Tocci testified that he has no recollection of Doherty informing him of the offers. Tr. at 621. According to Tocci, the substance of the conversation centered on his concern for two bargaining unit employees, Pierce and Smarro, whose pension rights were close to vesting. *Id.* at 594–95.[3] As a result of the August 15 communications, Doherty faxed Tocci a letter suggesting August 20, 21, 25, 28 and 29, 1997 as possible dates to bargain over effects. *Id.* at 713. At some point, the parties agreed to an August 21 date.

On August 19, 1997, Colony offered employment in Kingston to sixteen bargaining unit employees.[4] *See* GC–31. The pay offered was $12.36 per hour plus benefits, and the offers were to remain open until the following day.[5] *Id.* The offers also made reference to the ongoing effects bargaining, and indicated that such bargaining might result in the offeree's displacement by a fellow bargaining unit employee. *Id.* The offers were sent directly to the employees, and Dowdell spoke with those offered positions. Tr. at 92–93. One of the offerees was Brown, who testified that after handing him the letter of offer, Dowdell asked him what his answer was. Tr. at 336. Brown responded that he wasn't prepared to answer at that time, and Dowdell gave him until the end of the day. *Id.* After Brown noted to Dowdell that the offer would require him to "start over" with Colony after 26 years of employment, without his accrued vacation or sick time, Dowdell responded that "perhaps something could be worked out." *Id.* at 336–37. Brown also asserted that medical insurance contributions and travel expenses would reduce the hourly rate by $1.40, and that the offer did not provide for pension contributions. *Id.* at 338, 384. Colony did not provide copies of the offers to the Union. Tr. at 165.

Later in the day, Brown met with four or five other bargaining unit employees who received offers. Tr. at 374. The group found the offer unacceptable, largely for the reasons to which Brown testified. *Id.* at 375. Similarly, Haight, who also received an offer on the 19th, was critical of its terms and the manner in which it was made. Specifically, Haight testified that Dowdell refused to answer questions regarding the specifics of the offer, that Haight would essentially be starting over as a new employee, and that he would not have a choice of route as a driver as he had in Albany. *Id.* at 409–10. All but one of the sixteen individuals eventually rejected the offers. Tr. at 312; 498–99; 668.[6]

The parties met for bargaining on August 21, 1997. Present at this meeting were Martucci, Haight, Vickers, Brown, Tocci, Doherty and Jost. Tr. at 717. At the session, the Union again put on the table its proposal that the bargaining unit employees be transferred to Kingston with the CBA intact, and that seniority be dovetailed with the existing Kingston workforce. Tr. at 346, 415, 718; *see* R–20. If Colony did not agree to the transfer, the Union again proposed, in the

---

3. Doherty testified that the conversation regarding Pierce and Smarro took place on August 16, 1997. Tr. at 714; R–25.

4. Colony asserts the employees chosen were the fourteen "best" employees taken from the seniority list provided by the Union on July 14, 1997. *See* GC–19. The fourteen were not, however, chosen on the basis of seniority. Tr. at 165.

5. According to Doherty, Tocci called him on August 19 requesting that the offers remain open until August 21, to which Doherty agreed. Tr. at 715–16; R–26.

6. On August 20 or 21, 1997, the Union posted the following notice at the Albany facility:

> Local Union # 669 has turned down [Colony's] proposal to hire 16 employees for the Kingston facility.
> However, it is each employee's individual option to choose to accept a job offer.
> The people who choose to accept Colony's job offer for work in the Kingston facility will not be penalized for accepting the offer by Local 669.

R–9.

alternative, a package of two weeks severance per year of service, plus six months pension and health insurance contributions. Tr. at 346–47. The Union also explained to Colony why it had rejected the August 19 offers: the reduction in benefits, failure to follow seniority, and the fact that the terms and conditions had not been negotiated with the Union. Tr. at 416, 719–21.

The following day, Colony proposed to pay one week's salary to each regular employee who had not been offered, or who had rejected, employment at the Kingston facility. GC–25. The offer further stated that acceptance thereof "shall resolve all outstanding matters between" the Union and Colony. *Id.* The offer was to remain open until August 27, 1997. *Id.* On August 27, Tocci rejected the offer on behalf of the Union. Tr. at 723. The same day, Colony offered a settlement of $25,000, to be distributed by the Union pursuant to its own formula. Tr. at 724. Tocci responded that he would "pass it on," but that it was too low. *Id.*

By fax dated September 2, 1997, Doherty asserted to Tocci that Colony was ready to bargain over effects. GC–26. The Albany facility ceased operations on September 1, 1997, and most of the employees were terminated as of September 5, 1997. Tr. at 97, 418. At least seven non-Union Albany employees retained employment with Colony at Kingston with the same rate of pay and the same benefits. Tr. at 46–47, 81–84.

The Union filed second and third amended charges on September 30 and October 7, 1997, respectively. GC–1(c) and (d). The amended charges added allegations of direct dealing with employees, refusal to bargain concerning the relocation decision and its effects, and discrimination based on Union membership. *Id.* On October 15, 1997, the NLRB issued the original Complaint and Notice of Hearing underlying this action. GC–1(e). That Complaint alleged, *inter alia,* that Colony discriminatorily discharged and refused to transfer the bargaining unit employees based upon their Union membership. *Id.* at 4.

On October 27, 1997, Colony sent letter offers of employment, signed by Dowdell, to as many as twenty-five of the bargaining unit employees. The terms essentially were the same as those in the August 19 offer, but the hourly wage was slightly higher at $12.81. *Compare* GC–31 *with* GC–27. Colony again included the language warning the offerees that effects bargaining was continuing, and could result in displacement. GC–27. There is no evidence in the record that Colony notified the Union of these offers beforehand. Soon after learning of the offers, Wood sent Dowdell a letter, dated October 31, 1997. The letter read, in pertinent part, as follows:

> Please be advised that Local 669 is still the collective bargaining representative for . . . all your former drivers and warehousemen at the Albany County facility of Colony Liquor. As such collective bargaining representatives we object to Colony communicating directly with these former employees, and request that you meet with us as soon as possible to discuss re-employment of our bargaining unit members in Kingston and elsewhere.

GC–28.

The parties met again on November 4, 1997. Doherty asserted that Colony's offer of $25,000 was "on the table." Tr. at 731–32. The Union again proposed moving the bargaining unit employees to Kingston with dovetailing seniority, or one week severance per year of service. *Id.* at 166–70. At some point, Doherty expressed Colony's willingness to offer jobs at Kingston to every displaced bargaining unit employee, under the terms and conditions in effect at Kingston. Tr. at 274–75, 732–33. According to Wood, however, Colony refused to change its mind as to the terms of such an offer. *Id.* at 274. Eventually, according to Wood, Doherty took the $25,000 offer off the table. *Id.* at 167.

Doherty wrote Tocci on November 11, 1997 summing up the November 4 session. According to Doherty, the Union rejected Colony's offer of employment at Kingston to all of the bargaining unit employees under Kingston terms, and Colony rejected a Union "demand" to settle the matter for $500,000. GC–29. Nonetheless, Doherty asserted, Colony was still willing to bargain over effects.

Petitioner issued an amended Complaint and Notice of Hearing on November 25, 1997 and again on December 17, 1997.

## A. Procedural History

Petitioner, on behalf of the NLRB, filed the present petition for section 160(j) injunctive relief by order to show cause dated January 8, 1998. The petition sought an order, pending a final determination from the NLRB on the administrative Complaint, restraining Colony from (1) failing to bargain in good faith with the Union over effects; (2) failing to timely furnish information to the Union; (3) directly dealing with the bargaining unit employees; and (4) discriminatorily discharging the bargaining unit employees. Petitioner also sought affirmative relief in the form of an order directing Colony to (1) offer Kingston transfers to all bargaining unit employees under CBA terms; (2) bargain in good faith over effects; and (3) recognize the Union in Kingston and apply the CBA provisions to all Kingston employees, provided that once the bargaining unit employees were transferred to Kingston, they comprised a majority there.

The Court denied the request for an order to show cause on January 9, 1998 and assigned the petition a return date of February 9, 1998. On January 13, 1998, petitioner moved the Court to try the petition on the basis of the transcript and record of the administrative hearing. Colony opposed the motion and cross-moved to dismiss the petition. The Court granted petitioner's motion on March 14, 1998. The matter was heard before Administrative Law Judge Michael A. Marcionese ("ALJ") on February 2–4, 1998, and March 11, 1998.[7]

## II. Discussion

### A. Standard for Injunctive Relief

Section 160 of the NLRA allows the NLRB, upon issuance of a complaint charging that a person has engaged in unfair labor practices, to petition a United States district court for appropriate temporary relief or a restraining order. The district court, upon the filing of the petition, has jurisdiction to grant the NLRB such temporary relief as it deems "just and proper." 29 U.S.C. § 160(j).

■ The Second Circuit has made clear the circumstances under which section 160(j) injunctive relief is appropriate. " 'If the court has reasonable cause to believe that an unfair labor practice has occurred and that injunctive relief would be just and proper, it should grant appropriate relief.' " *Hoffman v. Polycast Tech. Div. of Uniroyal Tech.*, 79 F.3d 331, 333 (2d Cir.1996) (quoting *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir.1995)). The finding of reasonable cause, of course, does not involve a final determination on the merits of whether an unfair labor practice has occurred. *See Major League Baseball*, 67 F.3d at 1059; *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1033 (2d Cir.1980). Rather, reasonable cause exists where the Regional Director "has come forward with evidence sufficient to spell out a *likelihood* of [a] violation." *Danielson v. Joint Bd. of Coat, Suit, & Allied Garment Workers' Union*, 494 F.2d 1230, 1243 (2d Cir.1974) (emphasis added).

■ In conducting its analysis, the district court must show appropriate deference to the NLRB's judgment. *Id.* "Where there are disputed issues of fact, the NLRB is entitled to the benefit of the doubt." *Dunbar on Behalf of NLRB v. Landis Plastics*, 977 F.Supp. 169, 175 (N.D.N.Y.1997) (Pooler, J.) (citing *Seeler*, 517 F.2d at 36–37). The NLRB's factual findings should be sustained if within the range of rationality, and the charging party is entitled to have inferences from the facts drawn in its favor. *See Kaynard*, 633 F.2d at 1033; *Danielson v. International Org. of Masters, Mates and Pilots*, 521 F.2d 747, 751 (2d Cir.1975). In short,

---

7. The Court was prepared to issue its decision in this matter when it received notice on July 7, 1998 that the ALJ issued a decision in the unfair labor proceeding. Accordingly, the Court stayed issuance of its decision to allow the parties to address the ALJ's findings. Neither those findings nor the parties' additional arguments change this Court's conclusions. Indeed, the ALJ reached essentially the same conclusions as did the Court, lending further support to the present decision. *See Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 37 n. 7 (2d Cir.1975).

" 'a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed.' " *Hoffman,* 79 F.3d at 333 (quoting *Major League Baseball,* 67 F.3d at 1059).

The Court turns to the petition with this standard in mind.

## B. Reasonable Cause

Petitioner, in her December 17, 1997 amended Complaint and Notice of Hearing, alleges several violations upon which she premises the request for injunctive relief. Petitioner contends Colony violated the NLRA by: (1) terminating and refusing to transfer 45 bargaining unit employees to Kingston because of their Union membership; (2) refusing to bargain with the Union over the effects of the closure and relocation of the Albany facility; (3) failing and refusing to timely furnish the Union with information regarding the closure and relocation; and (4) bypassing the Union and directly dealing with the bargaining unit employees by offering them Kingston employment on terms unilaterally established by Colony.

The NLRA provides, in pertinent part, as follows:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment . . .

29 U.S.C. § 157. Section 158 of title 29 makes it an unfair labor practice for an employer:

**8.** Section 158(a)(1) "is the blanket [158(a)] provision that shields employees from unfair labor practices. In most unfair labor practice cases, the Board has rested its decisions primarily on the particularized provisions of [158(a)(2)(5)]; in

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \* \*

■ by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . \* \* \*

\* \* \* \* \* \*

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

*Id.* § 158(a)(1), (3), (5).

## 1. The Section 158(a)(3) Violation

■ Petitioner first argues that, in terminating and refusing to transfer the bargaining unit employees to Kingston, Colony violated section 158(a)(3) and, derivatively, section 158(a)(1).[8] A section 158(a)(3) violation is comprised of two elements: (1) discrimination (2) resulting in a discouragement of union membership. *N.L.R.B. v. Great Dane Trailers, Inc.,* 388 U.S. 26, 32, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *see N.L.R.B. v. National Car Rental System, Inc.,* 672 F.2d 1182, 1186 (3d Cir.1982).

■ The evidence adduced at the hearing supports a finding of reasonable cause as to the first element based on Colony's refusal to transfer or re-hire the bargaining unit employees. As early as February of 1997, Colony management was indicating it had no intention of staffing the expanded Kingston facility with bargaining unit employees. Tr. at 328. Colony further began hiring non-union workers at the expanded Kingston facility at the end of June of 1997, and into July of 1997, Tr. at 48, 78, after sending the WARN notices and after receiving word from the Union that the bargaining unit employees were ready to transfer to Kingston. *See* GC–14; GC–19. By the time of the July 24 bargaining session, Colony had hired 55

such cases, the Board has found that the employer has violated section [158(a)(1)] only derivatively." *Microimage Display Div. Of Xidex Corp. v. NLRB,* 924 F.2d 245, 250 (D.C.Cir.1991).

non-union employees to fill the positions at the expanded Kingston facility, Tr. at 145, having made no offers to the bargaining unit employees. Such evidence supports a finding of discrimination, to wit: non-union employees were considered for hire, and were actually hired at Kingston while union employees were not.[9] *See, e.g., National Car Rental,* 672 F.2d at 1186 (employer's refusal to consider union employees for transfer to new facility discriminatory under subsection (a)(3)).[10]

█ The second element of a section 158(a)(3) violation, resulting discouragement of union membership, "normally turns on whether the discriminatory conduct was motivated by an antiunion purpose." *Great Dane Trailers, Inc.,* 388 U.S. at 33, 87 S.Ct. 1792. Proof of anti-union motivation may be unnecessary, however, where the discriminatory conduct is " 'inherently destructive of employee interests.' " *Id.* (quoting *N.L.R.B. v. Brown,* 380 U.S. 278, 287, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965)). Petitioner relies on *Great Dane* 's presumption of improper motive in cases of "inherently destructive conduct" as to the allegations of Colony's refusal to transfer the bargaining unit employees to Kingston.

Colony argues that petitioner is foreclosed from relying on the "inherently destructive" standard for the simple reason that the NLRB itself took the position that Colony was not obligated to bargain over the *decision* to close and relocate the Albany facility. *See* 1/26/98 Doherty Aff. Ex. C. Relying on *Illinois Coil Spring Co., Milwaukee Spring Div.,* 268 N.L.R.B. 601, 1984 WL 35998 (1984), *aff'd sub nom., Intern. Union, United Auto., Aerospace & Ag. v. NLRB,* 765 F.2d 175 (D.C.Cir.1985) (*"Milwaukee Spring II "*), Colony argues that the lawfulness of the relocation itself precludes a finding that the resulting layoffs were "inherently destructive."

First, the Court disagrees with Colony's expansive reading of the NLRB's ruling in *Milwaukee Spring II.* In that case, the Board, discussing its earlier decision in the same case, specifically held as follows:

> In *Milwaukee Spring I,* the Board … found that Respondent's laying off employees as a consequence of its relocation decision violated Section 8(a)(3) notwithstanding that the parties stipulated there was no union animus. Invoking the "inherently destructive" doctrine of *Great Dane Trailers,* the Board apparently held that the [158(a)(3) ] violation flowed from the finding that the relocation decision violated Section [158(a)(5) ]. *Accepting this logic for the purposes of our decision only,* we conclude that, having found that Respondent complied with its statutory obligation before deciding to relocate and did not violate Section [158(a)(5) ], there is no factual or legal basis for finding that the consequent layoff of employees violated Section [158(a)(3) ].

*Milwaukee Spring II,* 1984 WL 35998, at *5.

As is clear from the language, the Board accepted the logical relationship between relocation decisions allegedly violative of section 158(a)(5) and section 158(a)(3) violations premised on resulting layoffs (a relationship Colony urges this Court to adopt) only for the purpose of undoing its prior holding. The Board gave no indication it was laying down a rule that discharges resulting from lawful relocations can never, as a matter of law, be "inherently destructive" of employee rights. After deciding *Milwaukee Spring II,* the Board continued to recognize that although no section 158(a)(3) violation may logically flow solely from a facility relocation found lawful under section 158(a)(5), an independent section 158(a)(3) violation theoretically may arise from an employer's discriminatory refusal or failure to re-hire, at the relocated facility, union employees affected by the relocation. *See Inland Steel Contain-*

---

9. Colony's August 19 and October 27, 1997 offers do not foreclose a finding of discrimination because the record is replete with evidence to support petitioner's contention that these offers were made "in a manner designed to encourage their rejection." Pet. Mem. of Law at 6. *See* GC–31, 27; Tr. at 338, 370,, 375, 384, 419.

10. This finding additionally is supported by Colony's decision to transfer several non-Union employees with no change in pay or benefits. *See* Tr. at 46–47, 81–84.

*er Co.,* 275 N.L.R.B. 929, 1985 WL 45529, at *17 (1985), *review denied,* 822 F.2d 559 (5th Cir.1987).

 Thus, while Colony's decision to relocate the Albany facility for economic reasons may have been lawful, Colony could not use the relocation as a pretext to rid itself of the bargaining unit employees because of their union membership. *See, e.g., Allied Mills, Inc.,* 218 N.L.R.B. 281, 1975 WL 5542, at *13 (1975) ("while the [relocation] was dictated primarily because of economic considerations, the Respondent utilized it as a vehicle to rid itself of the Union as the representative of the production and maintenance employees."). That being said, the facts in the record support a finding of reasonable cause as to conduct "inherently destructive" of employee interests. In *Allied Mills, Inc.,* the Board noted that a Company's refusal to allow union employees at a closed facility the opportunity to transfer "under some circumstances constitutes conduct which would appropriately fall within the ambit of the 'inherently destructive of employee interest' conduct." *Id.* Moreover, quoting the Second Circuit, the Board went on to observe that " '[t]he most important interest of workers is in working.' " *Id.* at *14 (quoting *Cooper Thermometer Company v. N.L.R.B.,* 376 F.2d 684, 688 (2d Cir.1967)). Petitioner could rationally take the position in the present case that that right was cut off when Colony went ahead and staffed the Kingston facility, fully aware that the bargaining unit employees were prepared to transfer there. *Id.*

Because petitioner met the "inherently destructive" standard, the Board could find an unfair labor practice absent union animus even if Colony introduced evidence that the discriminatory conduct was motivated by legitimate business considerations. *Great Dane Trailers, Inc.,* 388 U.S. at 34, 87 S.Ct. 1792. Colony offered no such evidence at the hearing. Accordingly, the Court concludes that there is reasonable cause to believe a section 158(a)(3) violation occurred with respect to Colony's refusal to transfer or rehire the bargaining unit employees at Kingston.

### 2. The Section 158(a)(5) Violations

Petitioner argues that Colony violated section 158(a)(5) by (1) directly dealing with employees via the August 19 and October 27, 1997 offers; (2) failing to furnish the Union with requested information until July 29, 1997; and (3) refusing to bargain over the effects of the relocation, including the right to transfer and the conditions under which the bargaining unit employees would work following the transfers.

 Under section 158(a)(5), an employer is required to bargain in good faith with a union. 29 U.S.C. § 185(a)(5); *Torrington Extend–A–Care Employee Assn. v. N.L.R.B.,* 17 F.3d 580, 588 (2d Cir.1994). This duty includes the provision of relevant and necessary information when requested by the union in order to carry out its own bargaining obligations. *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 303, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979); *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). Bargaining concerning the effects of a closing or relocation must be conducted in a meaningful manner and at a meaningful time. *First Nat'l Maintenance Corp. v. NLRB,* 452 U.S. 666, 681–82, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). Moreover, when the employees have chosen a union as their exclusive bargaining representative, the employer must bargain in good faith only with that representative. *Medo Photo Supply Corp. v. N.L.R.B.,* 321 U.S. 678, 683–84, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); *NLRB v. Pratt & Whitney Air Craft Div.,* 789 F.2d 121, 134 (2d Cir.1986).

The Court concludes that reasonable cause exists to support a section 158(a)(5) violation in each of the three respects asserted by petitioner.

#### a. Direct Dealing

 First, there can be little doubt that ample evidence in the record points to direct dealing. Colony made offers directly to bargaining unit employees, and unilaterally determined to whom those offers would be made and upon what terms, knowing that the Union in fact had taken a position on the terms of any transfers. *See Coated Prod-*

*ucts, Inc.*, 237 N.L.R.B. 159, 1978 WL 7801, at *11 (1978). In essence, Colony "ousted the Union from any role in negotiating what might be offered to employees desiring to transfer." *Cooper Thermometer*, 376 F.2d at 688.

Colony offers two arguments in opposition to the allegation of direct dealing, neither of which are convincing. First, Colony argues that the offers did not violate section 158(a)(5) because the Union "authorized" the offers. Tocci testified, however, that he does not recall Doherty ever informing him of the August 19 offers beforehand, Tr. at 621, and the Union made clear at the August 21 session that the offers were rejected in part because the terms and conditions had not been subject to bargaining. Tr. at 416, 719–21. Moreover, Wood made clear in the October 31, 1997 letter that the Union objected to Colony communicating directly with the bargaining unit employees by way of the October 21 offers. *See* GC–28.

Second, Colony argues that because the offers acknowledged Colony's obligation to bargain with the Union, and warned the offerees of possible displacement that could result from such bargaining, they were lawful. Colony relies on *Leland Stanford Jr. Univ. and Stanford Univ. v. United Stanford Employees*, 240 N.L.R.B. 1138, 1979 WL 8791 (1979) to support this argument. That such reliance is misplaced is clear from the ALJ's conclusion in *Leland Stanford* that an employer's taking of an opinion survey among union employees did not constitute an "attempt to 'deal with' employees with respect to their wages or terms and conditions of their employment, but at the most an attempt to elicit information from them ..." *Id.* at *12. The case thus did not even find a section 158(a)(5) violation based on direct dealing, much less that such a violation could be cured by an acknowledgment of the employer's duty to bargain.

### b. Timely Notice/Failing or Refusing to Furnish Information

▮▮▮▮ The "meaningful time" mandate with respect to effects bargaining requires that an employer provide the union with timely notice of the decision to relocate. *See*

*Los Angeles Soap Co.*, 300 N.L.R.B. 289, 1990 WL 161286, at *11 (1990) (citing *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 26 (1st Cir.1983)). Colony argues that it gave notice of the relocation decision in early May of 1997, four months before the Albany facility closed, giving the Union a sufficient opportunity to bargain over effects. This characterization of the notice given, however, is unconvincing.

First, evidence adduced at the hearing suggests that notice of the relocation was not given to the Union, at the earliest, until the WARN Act notices were sent to the employees on June 11 and 12, 1997. See GC–12, 13. The communications Jost had with Wood sometime in May were equivocal at best; Wood asked Jost about "rumors" of a relocation, to which Jost responded that no decision had been made on what positions would be transferred to Kingston. Tr. at 112. Jost also was unclear on the scope of the relocation. *Id.* As late as May 19 and June 2, 1997, the Union was still asking for confirmation as to whether, in fact, Colony had plans to move the Albany facility to another location. GC–10. Colony did not officially notify the Union of the decision until June 27, 1997. *See* GC–17a–b.

Moreover, though the Albany facility did not close until early September, over two months after the Union was given notice of the closing, Colony began filling the expanded Kingston positions at the end of June of 1997, and into July. Tr. at 48. Colony had hired 55 non-union employees to fill the positions at the expanded Kingston facility by July 24. Tr. at 145. The notice to the Union given in June thus left it with little bargaining power as to the positions in Kingston, as those positions effectively were filled or were in the process of being filled as the Union was receiving notice. Effects bargaining as to the transfers at that point essentially was futile, if not impossible. *See Los Angeles Soap Co.*, 1990 WL 161286, at *13.

Similarly, Colony did not respond to the Union's information requests of May 19, June 17, July 14 and 15, 1997, until the July 24 meeting. With the exception of the request for information regarding the reasons under-

lying the decision to relocate,[11] the information requested (i.e., whether and when the relocation would take place) clearly was relevant to effects bargaining. Because that information was not furnished until after Kingston had been staffed, it could not logically have served to bolster the Union's bargaining position in terms of the possibility of the transfer of the bargaining unit employees. *Cf. C–B Buick, Inc. v. NLRB*, 506 F.2d 1086, 1094 (3d Cir.1974) (no section 158(a)(5) violation where "[t]here is no indication that the Union's obligation to 'administer' the collective bargaining agreement might be affected by the information sought.").

### c. Good Faith Effects Bargaining

██ The Court concludes that the evidence of Colony's direct dealing and failure to provide information and timely notice with respect to the relocation support a finding of reasonable cause as to a section 158(a)(5) violation. Moreover, the record as a whole supports provides reasonable cause to believe that Colony refused to bargain in good faith over effects.

The evidence adduced at the hearing supports petitioner's position that as of the July 24, 1997 session, the Union wished to reserve its right to bargain over effects pending a determination of the NLRB and state arbitration proceedings. In any event, the Union had an effects proposal on the table by July 30: the bargaining unit employees would be transferred to Kingston with dovetailing seniority, and those employees not transferred would receive two weeks severance per year of service plus additional benefits. Tr. at 591, 709. The only "counterproposal," of sorts, Colony made thereafter, was made directly to the bargaining unit employees.[12] Colony offered no formal proposal to the Union at the August 21 bargaining session. Moreover, its "official" severance proposal of August 22 hardly evinced an intent to bargain in good faith. Colony offered one

week's salary to those employees that had not accepted the "directly dealt" August 19 offers. Moreover, the proposal ostensibly was in resolution of "all outstanding matters" between the Union and Colony, and expired by its terms a mere five days later. GC–25.

As Judge Friendly opined in *Cooper Thermometer*, "the Board may reasonably consider that an employer does not fulfill his obligations under [section 158(a)(5) ] if he refuses even to discuss on what basis [its employees] may continue to be employed." 376 F.2d at 688. Colony's position that it engaged in good faith bargaining regarding effects is based upon a self-serving interpretation of the evidence adduced at the administrative hearing. The Court, however, is bound to interpret the facts and draw inferences in favor of petitioner and the Union. *See Kaynard*, 633 F.2d at 1033; *Danielson*, 521 F.2d at 751. On the basis of those facts, the Court concludes that there is reasonable cause to believe the Board would find that Colony violated section 158(a)(5) in each of the respects discussed.

### C. The Remedy

In addition to injunctive relief, in her petition, petitioner requests the following affirmative relief pending final disposition of the administrative action before the Board:

(a) an order requiring Colony to offer the bargaining unit employees reinstatement at Kingston to their former, or substantially equivalent positions under the terms and rates of the Albany CBA;

(b) an order requiring Colony to bargain over the effects of the decision to relocate;

(c) a conditional bargaining order requiring Colony to recognize and bargain with the Union at the Kingston facility if, upon compliance with the reinstatement order, the former Albany unit employees and/or any other employees at Kingston who have joined the Union constitute a majority of all the employ-

---

**11.** The Court agrees with the ALJ that under the NLRB's decision in *BC Industries, Inc.*, 307 N.L.R.B. 1275, 1992 WL 198453 (1992), the Union was not entitled to information regarding the reasons underlying the relocation. Accordingly, reasonable cause is not present as to a section 158(a)(5) violation in this respect.

**12.** Again, because this "counterproposal" was made directly to the bargaining unit employees in a manner "designed to encourage [their] rejection," it was not a proposal at all. *See* supra note 9.

ees in the appropriate bargaining unit at Kingston.

■ Section 160(j) injunctive relief "[i]s intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices." *Seeler,* 517 F.2d at 38. General equitable principles apply in determining the propriety of injunctive relief under section 160(j), *Silverman v. 40–41 Realty Associates, Inc.,* 668 F.2d 678, 680 (2d Cir.1982), and such relief will be "just and proper" if "the petitioner has demonstrated that there is a compelling necessity to preserve the status quo or prevent irreparable harm[.]" *Dunbar v. Northern Lights Enterprises, Inc.,* 942 F.Supp. 138, 145 (W.D.N.Y.1996) (citing *Mego Corp.,* 633 F.2d 1026).

■ The Court concludes that, as to the orders of reinstatement and effects bargaining, such relief is just and proper under the circumstances. Too much time has passed already since the relocation,[13] and further delay while awaiting the final decision of the Board would surely render any eventual remedy ineffective. *See Mego Corp.,* 633 F.2d at 1034. Moreover, reinstatement of the affected employees is the proper remedy where an employer has discriminated on the basis of union membership, *see Kallmann v. N.L.R.B.,* 640 F.2d 1094, 1100 (9th Cir.1981), and is a common remedy under section 160(j). *See Landis Plastics,* 977 F.Supp. at 176.

■ Colony specifically takes issue with the order of reinstatement only to the extent that it would require that the bargaining unit employees be reinstated at Kingston under the terms of the Albany CBA. Colony relies on the following language from *Cooper Thermometer* in this respect:

... the reinstatement offers should be on whatever basis emerges from good faith bargaining between Cooper and the Union;

recognizing the likelihood that such bargaining will produce little change from the current practices at [the relocated facility], we believe this would still be a much closer approximation to what bargaining would have yielded at the proper time. A sanction for refusal to bargain that would treat the guilty party as if he had agreed to what the other party demanded although the evidence shows he would have done nothing of the sort, would give insufficient respect to Congress' direction in § 8(d) that the obligation to bargain does not compel either party to agree to a proposal or require the making of a concession.

376 F.2d at 690. This language would be directly on point for our purposes if, as was the court in *Cooper Thermometer,* we were faced with nothing more than determining the appropriate remedy for "refusal to bargain" under section 158(a)(5).[14] That is not the case, however. The Court has found there is reasonable cause to believe Colony violated section 158(a)(3) in refusing to transfer or re-hire the bargaining unit employees based on their union membership. In such a case, ordering the remedy of reinstatement under the CBA terms will better serve to "make whole the employees for losses suffered as a result of the violation[.]" *Transmarine Navigation Corp.,* 170 N.L.R.B. 389, 390 (1968). Judge Friendly implicitly recognized this distinction in Cooper Thermometer, when he noted that cases involving discriminatory discharge were "inappropriate since in such cases there would be no reason to doubt that the discharged employee would otherwise have continued at his existing rate of pay." *Id.*

Concededly, the Court cannot say that "there is no reason to doubt" that, had Colony not discriminated against the bargaining unit employees will respect to transferral or rehire, those employees would have transferred to Kingston with CBA wages and

---

**13.** The Court notes that the bulk of the delay is attributable to petitioner's initial failure to provide any factual support for the petition, necessitating petitioner's request that the Court decide the motion on the basis of the record developed at the administrative hearing. That record and further supporting papers were not submitted in their entirety until May 27, 1998.

**14.** The Court notes, however, that Cooper Thermometer recognized the propriety of reinstatement even for section 158(a)(5) violations. *Id.* at 690.

benefits. The alternative remedy, however, would be to order reinstatement at the terms in effect at Kingston. That remedy would ignore Colony's section 158(a)(3) violation and would give Colony all of the benefit of its original discriminatory course of conduct. The Court concludes that reinstatement under the CBA terms will better "recreate in some practicable manner a situation in which the parties' bargaining position is not entirely devoid of economic consequences for the Respondent." *Transmarine*, 170 N.L.R.B. at 390; *see Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

The effects bargaining will not include the issue of the transfers, but will include bargaining over whether and to what extent the bargaining unit employees should continue to receive wages and benefits under the CBA while employed at Kingston. Nonetheless, the transferred bargaining unit employees should receive the wages and benefits under the CBA until the negotiations result in either a new agreement or a lawful impasse. *See Beverly Farm Foundation, Inc.*, 323 N.L.R.B. 147, 1997 WL 294690, at *25 (1997).

In her Memorandum of Law, petitioner requests for the first time an award of backpay. The Court declines to order such relief. A backpay award is not necessary to protect the status quo, and denial of such relief at this stage will not result in irreparable harm because such an order may be granted by the Board in its final decision. *See Rivera–Vega v. ConAgra, Inc.*, 876 F.Supp. 1350, 1373 n.30 (D.P.R.1995). Moreover, petitioner made no mention of such relief in her petition.

Finally, the Court declines to issue the conditional bargaining order. Such a remedy goes well-beyond preservation of the status quo and risks the possibility of the undesired imposition of a union upon the present Kingston employees. *See A&P Brush Mfg. Corp. v. N.L.R.B.*, 140 F.3d 216, 222 (2d Cir.1998); *National Car Rental System, Inc.*, 672 F.2d at 1191 (3d Cir.1982).

### III. Conclusion

In sum, the Court finds there is reasonable cause to believe the Board would find violations of section 158(a)(1), (3) and (5) as alleged by petitioner. The Court further finds that, with the exception of the conditional bargaining order and backpay, the injunctive relief requested by petitioner is just and proper. Accordingly, the petition is GRANTED. Respondent is therefore ENJOINED, pending a final determination of the Board, from:

(a) refusing to bargain in good faith with the Union over the effects upon the bargaining unit employees of its decision to close and relocate the Albany facility to Kingston;

(b) failing to timely furnish the Union with requested information concerning the closing and relocation of the Albany facility to Kingston, except insofar as that information concerns the reasons underlying the relocation;

(c) bypassing the Union and dealing directly with the bargaining unit employees over wages, hours and other conditions of employment;

(d) refusing to transfer or consider for transfer, or discharging the bargaining unit employees based upon their membership in the Union.

Moreover, respondent is hereby **ORDERED** to:

(a) offer positions in Kingston to the bargaining unit employees named on page six of the petition, under the terms and conditions in effect at the time of their discharge/layoff, the same as or substantially similar to the positions those employees held in Albany, without prejudice to their seniority or other rights and privileges, displacing, if necessary, any workers hired, contracted, reassigned or transferred to perform bargaining unit work at Kingston;

(b) bargain in good faith with the Union concerning the effects of the decision to close and relocate the Albany facility to Kingston, maintaining the transferred bargaining unit employees' terms and conditions of employment as they existed at the time of dis-

charge/layoff, until a new agreement or a lawful impasse is reached;

(c) post copies of this opinion and order at the Kingston facility where employee notices are customarily posted. Said posting shall be maintained during the Board's administrative proceeding, free from all obstructions and defacements; and Board agents shall be granted reasonable access to the Kingston facility to monitor compliance with this posting;

(d) within twenty days of issuance of this order, file with this Court, upon notice to petitioner, a sworn affidavit from a responsible official setting forth specifically the manner in which respondent has complied with the terms of this order.

IT IS SO ORDERED.